18 N.J. Super. 19 (1952)
86 A.2d 449
ARTHUR ROSELLE, LOUIS P. ROSELLE, CRESCENT ROSELLE AND PIETRO ROSELLE, PARTNERS, AND TRADING AS PIETRO ROSELLE & SONS, AND PIETRO ROSELLE, INDIVIDUALLY, PLAINTIFFS,
v.
LA FERA CONTRACTING CO., A CORPORATION, AND JAMES PETROZELLO COMPANY, INC., A CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided January 15, 1952.
*21 Messrs. Budd and Larner (Mr. Samuel A. Larner appearing), attorneys for plaintiffs.
Messrs. Gross & Blumberg (Mr. Morton Stavis appearing), attorneys for defendants.
STEIN, J.S.C.
Plaintiffs, Arthur Roselle, Louis P. Roselle, Crescent Roselle and Pietro Roselle, trading as Pietro Roselle & Sons, in the first count of the complaint pray for an accounting against the defendants because of a joint venture agreement made between them and the defendants. As to this count the defendants answering seek rescission of the joint venture agreement and allege fraud and misrepresentation at the time of the making of said joint *22 venture agreement, and that the work allotted to the defendants was grossly disproportionate to that allotted to the plaintiffs and resulted in hardship in that it imposed a burden not intended by the parties, and counterclaim in which they seek accounting against the plaintiffs.
In the second count of the complaint, Pietro Roselle, individually, seeks a judgment under an agreement in writing made by all of the joint venturers with him in which agreement he was retained as superintendent of the joint venture at $50 per week. To this count the defendants answer admitting the agreement, but say that the plaintiff failed to perform his duties as supervisor and pray rescission of the agreement.
On June 19, 1950, plaintiff and defendants executed a written contract under which they agreed to make a joint bid for the garbage collection contract in the City of East Orange. It was provided in the agreement that if their bid was successful and the contract awarded to them, performance under the contract would be engaged in by them jointly in the name of Roselle, La Fera, Petrozello Co. The joint venture was to commence on August 1, 1950, and was to continue for the life of the garbage collection contract and any renewals thereof in the same names. The parties to the joint venture were to make equal contribution by way of capital necessary for the conduct of the joint venture. The net profits, or net losses, after deducting all expenses attending the conduct of the business was to be divided equally between them.
The testimony adduced on the hearing reveals that the joint venturers had all heretofore been engaged in the collection of garbage and had made bids in various municipalities. Each was equipped with items used in the conduct of such business. The agreement provided that the equipment which each had was to be maintained and kept in repair out of the funds of the respective parties and the equipment was to revert to the respective owners after the termination of the joint venture.
*23 On July 31, 1950, a supplemental contract was made in which was recited that whereas the parties to the joint venture had been awarded the contract for the collection of garbage by the City of East Orange beginning the first day of August, 1950, for a period of five years, the joint venturers agreed to divide the city into three equal parts for the collection of such garbage during the entire term of the contract. It is not in dispute that for some time prior to the awarding of the contract the parties, all of whom were well acquainted with the area in which the garbage was to be collected, held many conferences and drew a number of maps in which they endeavored to determine the area to be served by the respective parties in the carrying out of the joint venture, and that they finally drew a map dividing the municipality into three equal parts. They next took up the question as to what area each of the joint venturers should serve in collecting garbage. A map as finally agreed upon shows the sections to be covered by the respective joint venturers "A" "B" and "C." The "A" section on the map is colored in blue, the "B" in red and the "C" in yellow. Before the supplemental agreement of July 31, 1950, was actually executed, but after the sections had been laid out on the map as "A" "B" and "C," the joint venturers discussed the question of whether the section so marked on the map should be assigned to each by drawing lots, but that was abandoned and the parties then executed the agreement in which section "A" colored in blue was allotted to Pietro Roselle & Sons, section "B" colored in red was allotted to James Petrozello Company, Inc., and section "C" colored in yellow was allotted to La Fera Contracting Co. The supplemental agreement recites, the reason why the division was made into three equal parts was to avoid difficulties which might arise in the future as a result of such division or allotment, and goes on to say that
"it is hereby agreed and understood that irrespective of which party performs more labor, work, and service than the other the acceptance of the labor, work, and service now established in accordance *24 with the map hereto annexed shall be the duty and assignment of each individual Party for the entire term of the existence of this contract; and, * * * it is further understood and agreed that any increase in the collection of garbage, ashes and refuse or the erection of buildings in any of the respective areas in the map hereto annexed has no bearing whatsoever for a demand in a change of the areas by any of the respective Parties."
The parties thereafter executed the contract with the city under their bid and received payments from time to time from the municipality which money was deposited in the bank account of the joint venture. After deducting certain administration expenses, the balance remaining was distributed in equal parts to each of the joint venturers. This practice continued monthly from the inception of the contract until some time in January, 1951, up to which time the books and records of the joint venture were maintained at the home of Pietro Roselle. Out of monies collected and deposited in the joint account regular distribution was made to the respective joint venturers in equal parts, leaving some reserve for operation and payment of supervision of the business.
Some time in January, 1951, payment to Roselle, notwithstanding he was caring for the garbage of the city in the portion thereof assigned to him, was not made to him but his one-third share in the account was retained and payment was refused to him upon the contention that the work allotted to him in his one-third portion of the city was unequal in that it was much lighter than the share allotted to the others.
The defendants at the trial attempted to justify the withholding of Roselle's share of the proceeds unless and until he complied with the demand of the defendants for a renegotiation of the work load, and the claim was made that Roselle was guilty of misrepresentation in connection with the making of the agreement for the division of the city. There is, however, a complete failure of proof of any fraud or misrepresentation on the part of Roselle in arriving at the division which the map appended to the supplemental contract *25 shows the parties agreed to. The testimony is replete with evidence showing the care and caution which was exercised by all of the parties in dividing the city's area into three parts. All of the parties were experienced bidders in the matter of garbage contracts and all of them were well acquainted with the city and the work which would be entailed in servicing the three districts. The joint venturers were experienced in the matter of the factors which were to be considered in the making of a proper bid as well as the factors that were to be considered in the matter of the division of the work. La Fera had been in the garbage collection business for a number of years in various municipalities and had performed this very contract in East Orange in a joint venture with one of the partners of the plaintiff from 1946 to 1947, and as a matter of fact, the members of the present venture performed the same contract from 1947 to 1950.
Before dividing the municipality into three parts the evidence shows the parties had considered that in one section the houses would be closer together and closer to the street line, while in another they would be farther apart and further set back from the street. They considered the kind of territory which would be different in the various sections; that operation in one area would cause greater wear and tear on equipment. These were the factors considered in the many conferences held prior to the actual allocation of the various areas which each was to service.
The joint venturers possessed of expert knowledge in such matters certainly knew that from time to time a greater burden might be cast on one than the other such as increase in area population, change of character of buildings such as apartment buildings which would affect collection of garbage and work load, and it was this which caused them to insert the provision to the effect that irrespective of which party performed more labor or service than the other, the acceptance of such labor and service established in accordance with the map should become the duty of each individual party for the entire term of the contract (which contract *26 with the municipality was for a term of five years), notwithstanding any increase in the collection of garbage or the erection of more buildings in any of the areas, and they therefore provided for such contingencies if they arose and said such should have "no bearing whatsoever for a demand in the change of the areas by any of the respective parties."
Judgment will be that the defendants account to the plaintiffs for moneys received under the garbage collection contract commencing with the period when equal distribution between them as provided for therein was withheld by the defendants. Defendants' counterclaim will be dismissed.
As to the second count, the agreement in writing made by the joint venturers was made simultaneously with the agreement establishing the work areas, and appointed Pietro Roselle as superintendent of the work to be performed under the garbage contract from August 1, 1950, to August 1, 1952, at the weekly salary of $50 per week. For the third year from August 1, 1952, to August 1, 1953, James Petrozello was appointed at the same salary, and for the balance of the five-year period Pietro Roselle was again to be superintendent. The answer of the defendants admit the making thereof but says that the plaintiff Pietro Roselle failed to perform his duties and was therefore discharged by the defendants.
The evidence is to the effect that this plaintiff did the work required of him to be done by way of superintendence pursuant to the written agreement. The letter written by the defendants say that he is discharged and "notified that your employment by the Joint Venture as Superintendent is hereby terminated as of February 3, 1951." This action was taken without consultation or concurrence on the part of the third member of the joint venture, the partners trading as Pietro Roselle & Sons. The letter assigns as a reason for his discharge "that the welfare of the Joint Venture requires" the same. There is no question that plaintiff's discharge was part and parcel of the attempted scheme by defendants which prompted the withholding of payment to plaintiff under the joint venture agreement and to rescind the same.
*27 It has been clearly established by the acts of the parties that the plaintiff was wrongfully discharged, and therefore the sole issue becomes one of damages. The contract sets his salary and it is readily computed from the time that the last payment was made, November 26, 1950.
This contract does not involve an employment contract creating an employer-employee relationship, but rather is a part of the basic consideration for entering into the joint venture. The agreement was entered into simultaneously with the joint venture agreement and was intended to provide for additional compensation to two individuals, who were members of two of the units in the joint venture, namely Pietro Roselle and James Petrozello. The services required of them are not defined in the contract, except that they are designated as "superintendent." The testimony shows that the superintendent was not required to spend full time for the salary of $50 per week. His job was merely that he be available to supervise generally and check complaints at the city hall. He testified that while performing this work as superintendent, he also performed similar type in connection with other contracts held by Pietro Roselle & Sons, and this testimony was not controverted. He was at most a part-time employee and such was his status as revealed by the testimony.
Defendants say that this plaintiff is not entitled to judgment on the ground that there is no showing that he sought employment elsewhere. The testimony shows that he was ready, able and willing to perform the services required by his contract at all times. He did continue to circulate and to check complaints concerning the service at the city hall, and he says, and it is not denied, that the individual foremen of the two defendants refused to take orders from him or to cooperate with him in any way in connection with his service as superintendent.
It has been held that an exception (to the mitigation rule) also exists in cases where the services contemplated by the contract of employment are consistent with the pursuit of other duties by the employee and do not purport to occupy all *28 of his time. Thus excluded from the rule is the case of a salesman or part-time servant, when the money earned by him after the discharge could likewise be earned by him without a violation of his duty under the contract if he had not been discharged, even though he made more money after the breach than before. 56 C.J.S., p. 474.
Again the burden of proving facts in mitigation of damages rests with the defendants. The record in the case at bar is barren of any proof by the defendants that under the circumstances involved, the particularized type of employment, the type and age of the employee and the available sources of similar employment as a superintendent, that the plaintiff did secure other employment or could reasonably have secured such other employment.
"* * * The principle is well established that in an action to recover damages for wrongful discharge from employment the defense that the claimant earned or could have earned a livelihood during the term of his discharge is an affirmative one, and the burden of proof rests upon the defendant."
Gordon v. Tomei, 144 Pa. Super. 449, 468, 19 A.2d 588, 597 (1941); Lucacher v. Kerson, 158 Pa. Super. 437, 45 A.2d 245 (1946).
In view of the fact that the defendants have the burden of proof of that issue and that it is an affirmative defense, the plaintiff was not bound to offer evidence that he had sought other employment. To the same effect, see Krawitz v. Ganzke, 159 A. 897 (Sup. Ct. Errors, Conn.).
As stated by the Court of Errors and Appeals of Maryland in Atholwood Development Co. v. Houston, 19 A.2d 706 (Md. Ct. App. 1941):
"The measure of damages in an action for wrongful discharge is prima facie the employee's salary for the remainder of the period of employment. But the employer may undertake to mitigate the damages by showing that the employee has earned wages from other employment, or that he could have secured other employment by using proper effort."
*29 The defendants in the case at bar not only failed in this regard, but did not set up this defense in the answer or the pretrial order. The sole issue raised in the pleadings was whether the discharge was proper. The evidence is clear that the discharge was unwarranted and the defendants cannot at this time complain about the failure to seek other employment, since this issue was part of their burden by way of allegation and proof.
As to the suggestion by defendants that the plaintiff was under a duty to continue to tender his services regularly each day, the testimony indicates a general availability to perform under the terms of the contract, but even if this were not so, the discharge of the plaintiff removes the necessity of continued performance of the services. As stated by the Supreme Court in Diffley v. Jacobson Manufacturing Co., 6 N.J. Misc. 1044 (Sup. Ct. 1928), affirmed 105 N.J.L. 631 (E. & A. 1929):
"It is contended finally that it was the duty of the plaintiff to continue to tender his services. This is not true if as appears he had been definitely dismissed. It was not incumbent on him to pursue a fruitless offer to continue to work for one who had terminated the contract."
Judgment will be entered requiring the defendants to pay to the plaintiff, Pietro Roselle, out of the monies of the joint venture, the sum of $50 per week salary withheld by them from the last date of payment, November 26, 1950, to the date of the hearing.