248 N.J. Super. 215 (1991)
590 A.2d 723
STEVEN WONG (AMENDED TO THE ESTATE OF STEVEN WONG) AND DORIS WONG, SUSANNE BINGHAM REALTIES, INC., A NEW JERSEY CORPORATION, PLAINTIFFS,
v.
GONZALO MERCADO AND MARIA MERCADO, DEFENDANTS.
Superior Court of New Jersey, Law Division Bergen County.
Decided February 7, 1991.
*219 Gene Schiffman for plaintiff (Schiffman, Berger & Kaufman, attorneys).
Robert A. Ferraro for plaintiff-intervenor (Bruno & Ferraro, attorneys).
Alan Zark for defendants.
MARTIN J. KOLE, J.A.D. (retired and temporarily assigned on recall).
This is an action by the sellers of a one-family house and their broker for damages against an alleged defaulting purchaser.
*220 Plaintiffs Wong and defendants Mercado entered into a contract dated July 15, 1987 under which Mercado purchased from Wongs the latter's one-family house at 357 Park Avenue, Rutherford, New Jersey for $200,000. The contract, after revisions by the parties' attorneys, provided for a $15,000 deposit and allowed the Mercados to have a home inspection made. The Wongs agreed to pay up to $500 for "repairs required to roof, gutters, basement, electrical, heating and/or plumbing systems, or to correct a deficiency in the structure of the premises." If such excess was above $500 the Wongs could either correct or repair the deficiency or structure before the closing or cancel the contract. They were required to notify the Mercados in writing "immediately upon receipt of the report" as to which option they were exercising. The Mercados, however, could waive the results of the inspection report and close title. The contract provided for a broker's commission of $12,000 to be paid by the Wongs to plaintiff Susanne Bingham Realtors, Inc.
No mention was made in the contract of radon or inspection therefor in the house. Indeed, none of the parties, including the broker, was then aware of any radon problem or had knowledge of the degree of health hazard associated with radon  i.e., what was or was not actually hazardous.
In August 1987, the Wong's attorney, James Ely, Jr. received a copy of the home inspection report prepared by American Home Inspection Corporation (American), dated August 14, 1987. He sent it to the Mercado's attorney, Alan Zark. The report showed repair problems relating to a lead pipe, electrical fixtures and exposed asbestos. It also had a "Special Note" reading as follows:
Special Note
Due to the possibility of radioactive RADON gas within the structure, it is recommended that a Radon Certification Test be conducted to insure that a hazardous and unsafe level does not presently exist. Please contact the office so that suitable testing can be arranged.
*221 The Wong's attorney, Ely, offered to have them pay a total of $500 to cover all repairs. He received no answer from Zark. Zark later requested an extension of the mortgage commitment date provided in the contract, which was granted by Ely. Neither the Mercados nor their attorney then mentioned anything about radon, even though the Mercados, by that time, had ordered a radon test suggested by the special note in the inspection report.
A notice of settlement was filed by the Mercados on September 24, 1987.
The title closing was set for October 16, 1987. On the day of closing but before the closing itself, the Mercados telephoned American and learned from American orally that the radon test had been conducted and the reading was 2.9 pCi/L. Immediately after receipt of this oral advice, the Mercados called the New Jersey DEP. They asked whether a 2.9 pCi/L level was safe. They were told that the DEP did not use the word "safe" but that it recommended action beyond 4.0 pCi/L. None of this information was imparted to Ely or to the Wongs until the actual closing, although Zark, on the day before the closing, had advised Ely that there might be a repair problem, without mentioning radon.
At the closing on October 16, 1987, Zark informed the Wongs' attorney, for the first time, that there was a radon reading of 2.9 pCi/L. Both attorneys then knew that some level of radon required remedial work and that there was also a level at which a house could be untenantable. But neither knew the effect that a 2.9 pCi/L reading had in this respect. Additionally, both parties agreed that the Mercados would be given a $500 credit to cover all repairs, other than those required for radon. The Mercados wanted to have a three-day radon test performed.
Accordingly, the parties closed title in escrow and entered into a handwritten agreement of October 16, 1987 (hereinafter the "supplemental agreement") adjourning the closing for two weeks and providing:

*222 1. Closing adjourned maximum of 2 weeks subject to receipt of 3 day Radon test by purchaser at their expense.
2. If Radon test discloses the home is untenantable  i.e., not repairable then buyer may elect to cancel contract and deposit monies are returned.
3. If some Radon repair work is necessary to clear a low level of Radon, title shall close and costs to clear shall be split 50/50.
4. Other than the above, the parties agree to close and pay according to RESPA figures shown on statement signed today (i.e., all other home inspection repair items are settled for the 500 credit given on RESPA.)
For some reason only known to the parties, the 2.9 pCi/L level was not mentioned at all in this supplemental agreement.
On October 17, 1987, the day after the closing, the Mercados received American's written report, which stated the following:
The Radon screening test conducted at the above referenced property indicated a level of 2.9 pCi/L within the structure.
The EPA recommended remedial action level for Radon is one that exceeds 4.0 pCi/L. Your radon level is below this.
As a precautionary measure, because an active level of Radon was detected, it is recommended that the structure be tested on an annual basis to insure that there is no change in the Radon level that would require immediate remedial action.
In some fashion, after October 16, 1987, the Mercados discovered that American had conducted a three-day radon test. In any event, they did not have another test performed as contemplated at the closing. Nor did they seek any further advice from American or any expert. Instead, they requested their son, a student at Stevens Tech, to obtain literature for them on radon. They reviewed the documents received. All of them indicated that a level 4.0 pCi/L was a threshold of concern and that remedial action might not be necessary if the reading was 4 or less. There was ample evidence before the Mercados from these documents to warrant a reasonable person to conclude that no remedy or repair was required for a level of 4 or less  here 2.9  and that a reading of 4 or less did not make the house untenantable.
Indeed, one of the documents upon which they relied  the Consumer Report  stated that there is no level at which radon can be called completely safe, that outdoor radon readings are *223 0.1 to 0.2 pCi/L, and that the average indoor radon level of 1.5 pCi/L resulted in estimated lung cancer deaths of 3 to 13 per 1000. It further asserts that at "4 pCi/L, the EPA's "action level" for indoor radon, the estimated rate is 13 to 50 deaths from lung cancer for every 1,000 people exposed.... [As] many as 8 million [single-family houses] are believed to have radon levels greater than the EPA's action level of 4 pCi/L." Emphasis supplied. It also states:
If the reading is 5 pCi/L or less, the risk is proportionately lower. While any steps to reduce the reading will be beneficial, your average radon level may be close enough to the irreducible outdoor background level to make a large reduction difficult.

The trickiest situation occurs when a reading is between 5 and 20 pCi/L. In CU's judgment, that calls for follow-up testing, preferably of the areas in which the family spends the most time. Since correction isn't urgent in this intermediate radon range, we recommend using alpha-track detectors. Their three-to-six month sampling give a more-exact picture of how much radon you're actually being exposed to in the long term. [Emphasis supplied]
The Consumer Report additionally states that ventilation "can suffice if initial readings are "below about 50 pCi/L." Such a remedy, it states, includes fan-forced ventilation costing no more than $150, with $100 a year for electricity. Where radon levels are above 40 pCi/L, it says, there are remedies that could cost up to $2,000 to $2,500 to install, with additional electricity costs. It also cites a recommendation of the American Society of Heating, Refrigeration and Air Conditioning Engineers to use "ventilation" systems to keep the levels below 2 pCi/L.
Another document the Mercados reviewed, "Facts and Recommendations on Exposure to Radon," published by the New Jersey Department of Health, contained essentially the same information. Among other things, it stated that if the radon level exceeds 4 pCi/L, "we urge you to take action to reduce these concentrations or to minimize time spent in areas with the highest concentration." It further states, as to concentrations below 4 pCi/L:
Although these are considered acceptable concentrations, we encourage residents to take all practical steps to reduce or keep radon concentrations as low as possible.
*224 The Department of Health booklet also said that there was a health risk even at low levels, since no level was without risk; that the typical home had a 1 pCi/L level; and that below 4 was acceptable but residents were encouraged to take all practical steps to reduce and keep radon concentrations as low as possible.
The EPA Radon Reduction Methods booklet, which the Mercados received, among other things, stated that "you should ventilate the lowest level of your house, where it is in direct contact with the primary source of radon: the soil. If you have a basement ... that is the area to ventilate." A remedial method of block-wall ventilation, requiring installation of exhaust pipes in an unfinished basement "would cost about $2,500," with operating costs about $140 or less per year.
The Mercados also relied on a State DEP letter with an enclosed booklet, "A Citizens' Guide to Radon," received after October 16, 1987. The letter referred to a program of confirmatory monitoring for individuals whose home radon test indicated a level greater than the 4 pCi/L "guidance level recommended by the EPA" and advised:
If you have a radon test done in your home and the measured value is 4 pCi/L or greater, please call . .. to arrange for confirmatory monitoring ... at no cost to you.... Our experience ... shows that radon is a naturally occurring problem that can be controlled.
The enclosed Citizens Guide to Radon stated the following, which was of concern to the Mercados: "It contained a Radon Risk Evaluation Chart showing that between 2 and 4 pCi/L, the comparable lung cancer risk over a lifetime is 200 chest x-rays per year. Exposures in the range of 4 pCi/L or lower are considered average or slightly above average for residential structures. Although exposure in this range does present some risk of lung cancer, reductions of levels this low may be difficult, and sometimes impossible, to achieve." Emphasis supplied. It continues: "Since radon concentrations tend to be greater in the lower levels of a home, a person who sleeps in *225 the basement is likely to face a greater risk than a person who sleeps in a second-floor bedroom."[1]
It should also be noted that after October 15, 1987, the Mercados received from the broker and from Ely a document which stated that the EPA "has set the safe level of exposure to Radon gas in the home to be any level under 4.0 pCi/L. The results of your test indicated that the level of radon gas which you are exposed to is in the safe range. Therefore, the EPA would recommend that no remedial action be taken." However, it then presents a "Radon Risk Evaluation Chart," published by the EPA  Office of Radiation Programs, showing that between 2 and 4 pCi/L, the comparable lung cancer risk over a lifetime is 200 chest x-rays per year. (This is the same chart that was contained in the Citizens Guide to Radon, already discussed.) It also asserts that radon levels in basements are typically two-to-three times higher than in the upper floors. It should be recalled that the Citizens Guide also indicated that concentrations of radon would be greater in the basement.
It was this type of information that concerned the Mercados, particularly since they had intended that 2 of their 5 children would have bedrooms in the basement. Thus, Mrs. Mercado informed Zark, after receipt of all of the information, that 2.9 pCi/L was too high for them, stating that one of the reviewed documents indicated that anything over 2.0 pCi/L was a hazard to health.
After receipt and consideration of all of this data, the Mercados discussed the matter with their son at Stevens.
Meanwhile, Ely and plaintiffs Wong had also received data relating to radon, including American's report. Ely telephoned *226 the DEP. Plaintiffs concluded that, in view of the 4 pCi/L level, no remedial action, by way of repairs or otherwise, was necessary and that the house was tenantable with that radon level.
Accordingly, Ely wrote Zark a letter of October 22, 1987, with a copy to the Mercados, making time of the essence for a closing "on or before October 30th." This letter stated:
This will confirm the above matter was to close in your office on Friday, October 16th, and at said time all parties were present and the closing documents executed and held in escrow basically for two reasons:
1. Purchaser was unable to have PM Mortgage funds available but expected same early this week, and
2. The matter was held in escrow because purchasers had on their own obtained a Radon inspection but had only received an oral inspection report indicating a Radon level of 2.9 pCi/L which they indicated they had been told was an unsafe level. At the time you and I as attorneys for the parties indicated that we did not know what was a safe level therefore the matter was held in escrow for a maximum period of two (2) weeks in accordance with the terms of the handwritten escrow agreement executed that day.
Under the above escrow agreement your client was then to obtain a three-day Radon test (believing it had not been done) and that you and I would arrange to ascertain a safe level for Radon and if an unsafe condition existed, the parties agreed to split the cost of correcting same.
This week through my investigation and my conversations with you, you indicated a three-day test was not being performed since American Home Inspection Corporation's test in September was a three-day test. Additionally, I enclose herewith a letter of American Home Inspection Corporation Radon test report dated October 14th in which they advised me that they originally had sent to your clients and to you but you had not received a copy. They indicate the 2.9 level report and note that the EPA recommend remedial action only if the Radon level exceeds 4.0. I additionally have spoken to the New Jersey DEP and they advise me that the Federal EPA and the New Jersey DEP consider any Radon level below 4.0 is safe and does not require remedial action.
Based upon the above, it is the position of my clients as sellers that in regard to Radon exposure the premises is tenantable and that no remedial action concerning Radon is necessary and that title closing should proceed on or before October 30th. I therefore give notice making Time of the Essence for the completion of the escrowed title closing in accordance with the closing documents and RESPA statement previously executed. In this regard, I further confirm our agreement made at closing that purchasers assume liability for additional funds to pay off sellers' first mortgage to Citibank in excess of the RESPA statement figure and that sellers assume extra interest expense on second mortgage to Wesley Smith, Trustee, in excess of the figure shown on RESPA.
*227 The Mercados then discussed the matter with Zark, who thereupon sent a letter of October 29, 1987 to Ely voiding the contract and demanding the return of the deposit money. That letter stated:
I have reviewed your correspondence of October 22 with my clients. It is their opinion that the position in which they are left is untenable.
On the one hand, they are advised by the inspectors that as unbelievable as it seems to all parties, there is a significant level of radon gas in the Wong home. Your previous letter to me indicated that the inspection indicated a level of 2.96 picacuries. It is our understanding from the DEP in Trenton and the Federal EPA that this is a significant level which may very well pose a significant health hazard to the Mercado family. Your letter indicates that your clients will take an opposite position that this is not a significant level and will take no action to remove the radon condition from the premises.
On the other hand, we have a contract modification agreement signed in the presence of counsel for all parties, indicating that if the home was "untenantable" that my clients will be absolved from all liability under the contract and the said contract would be null and void. In addition we have the original contract provision which provides for the home inspection to disclose inherent defects in the premises.
It would appear to me and my clients, that relying on the home inspection clause and the contract modification, that the agreement between our respective clients should be rendered null and void and the deposit money held in this matter refunded to Mr. and Mrs. Mercado.
By this letter we are giving you notice that we do deem the contract null and void and request that you refund the deposit held by you at this time directly to Mr. and Mrs. Mercado.[2]
After receiving this cancellation letter, the Wongs again listed the property with the same broker, Bingham. Unfortunately, at about the time of the cancellation and thereafter, there was a substantial decline in the stock market and the market for the sale of homes was adversely affected to a significant degree.
The house was relisted at a $197,000 sales price. There were no buyers. Additionally, in reliance on the sales contract with *228 the Mercados, the Wongs had purchased another house in August 1987 to which they had already moved and Mr. Wong became very ill. He is now deceased.
The broker arranged for a six-month lease of the house commencing January 15, 1988, at $1,000 a month with a view towards eventually selling the premises. On April 26, 1988, the house was contracted to be sold to Bigley for $182,000 through the efforts of another broker in the multiple listing system. The Bigley sale closed on July 20, 1988. The share of the commission on the Bigley sale that the broker, Bingham received was $5,500. I have concluded that the broker diligently endeavored to resell this property and that the Bigley price was the best price obtainable during the period October 29, 1987 to April 26, 1988.
There was a second mortgage which the Wongs had given to a Mr. Smith, in August 1987 for a bridge loan to enable them to purchase their new home. Had the closing taken place when scheduled on October 29, 1987, this mortgage would have then been paid and further interest would not have had to be paid by the Wongs to Smith.
This action followed.
I am satisfied that defendants acted with subjective good faith in declaring the contract null and void. They were genuinely concerned that a level of radon as high as 2.9 pCi/L might be hazardous to their health and the health of their children. This is particularly so since they intended to have two of their sons reside in the basement where concededly the level or concentration of radon is higher than elsewhere in the house. But subjective good faith does not suffice to justify the termination of this contract.
The seller cannot be required to take the risk of the purchaser's personal concerns or fears as to health dangers incident to a radon level. An objective test is required. The *229 good faith that could legally justify a refusal to perform a contract must be predicated on the objective reasonableness of that refusal. See Fitzmaurice v. Van Vlaanderen Mach. Co., 110 N.J. Super. 159, 163-164, 264 A.2d 740 (App.Div. 1970) and affirming opinion, 57 N.J. 447, 449-50, 273 A.2d 561 (1971); Urban Farms Inc. v. Seel, 90 N.J. Super. 401, 402, 217 A.2d 888 (App.Div. 1966); Grobarchik v. NASA Mortgage & Investment Corp., 117 N.J.L. 33, 34, 186 A. 433 (Sup.Ct. 1936).
In the present case there is ample evidence that was available to both the seller and the purchaser between October 16, 1987 (the date of the supplemental agreement relating to radon) and October 29, 1987 (the date of purchaser's contract cancellation) that 2.9 pCi/L or any level below 4.0 pCi/L would not require repairs or remedies; and that any repairs or remedies would not so reduce the level of radon as to make the house, as a practical and objective matter, any less a realistic health hazard than the 2.9 pCi/L known to the parties. The house was not untenantable  i.e.,, not repairable  within the meaning of the contract. Under these circumstances, it is clear that the purchasers' refusal to perform the contract and their determination to cancel it was objectively unreasonable and did not justify their refusal to perform. This does not constitute the legally requisite good faith by the purchasers. Where, as here, there is an undue sensitivity to the danger of the condition involved, the purchaser, not the seller, must bear the risk of nonperformance.
Additionally and significantly, at the very least, before cancelling the contract, defendants should have communicated to plaintiffs the nature of the remedies or repairs they wanted in order to reduce the level from 2.9 pCi/L to a lower level, and why they wanted it reduced  e.g., they were going to use the basement for bedrooms for their children and were fearful that the 2.9 pCi/L level would be too high, so that the seller would have specific objections, reasons, remedies and costs to address. *230 No such communication was given.[3] This type of communication is implicitly required in the October 16, 1987 supplemental agreement. See Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182-183, 425 A.2d 1057 (1981); Einhorn v. Ceran Corp., 177 N.J. Super. 442, 449, 426 A.2d 1076 (Ch.Div. 1980).
For all of these reasons, I find that defendants did not have the required good faith under the law to permit them to nullify the contract. They thus breached the contract and are liable for such damages as were proximately caused by their breach  that is, such damages as were necessarily or substantially caused by the breach.
This brings me to the matter of the extent of damages to be allowed plaintiffs  the seller and the broker.
I will first deal with the damages recoverable by the sellers.
It was evident to both the sellers and purchasers on October 16, 1987, when the supplemental agreement was entered into, that defendants had obtained a report from the testing service showing a 2.9 pCi/L reading. It is in the light of that information that that agreement must be interpreted or construed. Neither party then knew the significance of a 2.9 pCi/L level. Accordingly, it was contemplated by the parties that they were to find out and determine whether the radon test level made the home untenantable, that is  not repairable, in which event the purchasers could cancel the contract and obtain their deposit monies; or as the agreement goes on to say:
If some radon repair work is necessary to clear a low level of Radon, title shall close and costs to clear shall be split 50/50.
This agreement has an inherent ambiguity in it. Based on events that occurred after the agreement, it is unclear what paragraphs two and three mean. For example, does "untenantable i.e., not repairable" mean some specific amount that could *231 not be reduced to a nonhazardous level even if an attempted remedy or repair were made? If the house is repairable and thus tenantable, does paragraph three dealing with repair work necessary to clear a "low level" of radon apply to a level of 2.9 or some other higher or lower level?
Faced with this ambiguity, and in light of the information received by both parties after October 16, 1987 relating to radon, each of them was under a duty to discuss with the other the steps, if any, that should or could be taken to repair so as to achieve a low level of radon within the meaning or intent of the supplemental agreement.
Plaintiffs had an obligation under that ambiguous agreement to be reasonable in their dealings with the purchasers on this issue. It was not reasonable of sellers to refuse to make any repairs and thus make time of the essence, instead of first inquiring of defendants as to their concerns and what, if anything, they proposed should be done to alleviate or remedy them. At that point perhaps something could have been worked out which would not have resulted in cancellation of the contract by defendants.
By the same token, defendants had the obligation to communicate their concerns to sellers and to advise them that in their view, 2.9 was a low level of radon which, under the agreement, required repair work to "clear." They were also under a duty to make inquiry of experts as to the realistic dangers to health posed by the 2.9 pCi/L level and the cost of remedying any such danger. Such failure, I have already held, is one of the bases for defendants' liability for breach of the contract. The Mercados had a much more substantial burden in this respect than the Wongs.
Plaintiffs, in their letter of October 22, 1987, adopted what appears to be a take-it-or-leave-it attitude. I find that stance violated their obligation to take reasonable steps to avoid losses created by the subsequent breach of the agreement by defendants. *232 The principles of avoidable consequences and mitigation of damages are applicable to this situation.
There are some basic principles involving the measurement of damages that are applicable here.
Compensatory damages are designed to put the injured party in as good a position as he would have had if performance had been rendered as promised. Good sense, rather than a mechanical application of any single formula, is a fundamental factor in arriving at damages suffered by a claimant. 525 Main Street Corp. v. Eagle Roofing Co., 34 N.J. 251, 254-255, 168 A.2d 33 (1961).
The amount of damages recoverable by reason of defendants' wrongful conduct is that amount which will reasonably and fairly compensate plaintiffs for the losses proximately caused by such conduct. There must be reasonably certain and definite consequences of such conduct as distinguished from mere quantitative uncertainty. If the evidence affords a basis for estimating damages with some reasonable degree of certainty, it is sufficient. The rule relating to the uncertainty of damages applies to the uncertainty as to the fact of damage and not as to its amount. Where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery. Tessmar v. Grosner, 23 N.J. 193, 203, 128 A.2d 467 (1957); Restatement, Torts, 2d, 912 at 478.
But the party seeking damages must show he has reasonably endeavored to mitigate them. Mitigation of damages is a reduction of the amount of damages based on facts which show that the party's conceded cause of action does not entitle him to so large an amount as the showing on his side would otherwise justify. Thus, certain acts or failures to act of the party are taken into account in computing the amount of his recovery. White v. Tp. of North Bergen, 77 N.J. 538, 546, 391 A.2d 911 (1978). Mitigation of damages is a doctrine applicable to breach of contract cases, provided the factual complex permits its application. Sommer v. Kridel, 74 N.J. 446, 454-458, *233 378 A.2d 767 (1977); Sandler v. Lawn-A-Mat Chem. & Equip. Corp., 141 N.J. Super. 437, 454-457, 358 A.2d 805 (App.Div. 1976), certif. den. 71 N.J. 503, 366 A.2d 658 (1976); Stark v. Nat. Research and Design Corp., 33 N.J. Super. 315, 323, 110 A.2d 143 (App.Div. 1954).
The seller of real property, who is without fault, has the right to retain the deposit paid by a buyer who refuses to perform in breach of a contract, even if the seller has not sustained any actual damage; and, in addition, the seller may recover compensatory damages in excess of the amount of the deposit retained. Oliver v. Lawson, 92 N.J. Super. 331, 223 A.2d 355 (App.Div. 1966); Ruane Development Corp. v. Cullere, 134 N.J. Super. 245, 339 A.2d 229 (App.Div. 1975); Central Steel Drum Co. v. Gold Cooperage, Inc., 200 N.J. Super. 251, 262-263, 491 A.2d 49 (App.Div. 1985); Sheehy v. Galipeau, 48 N.J. Super. 95, 137 A.2d 5 (App.Div. 1957); Kingdon v. Sickler, 2 N.J. Super. 183, 62 A.2d 710 (Ch.Div. 1949). The excess compensatory damages are discussed below.
Plaintiffs claim that their letter of October 22 merely stated a position and that, before the stated closing date, they expected defendants to come back with a request relating to the extent of repairs instead of cancelling the contract. In essence, the claim is that the letter expressed only a negotiating position and that time was made of the essence to get a discussion going. However, a fair reading of the letter does not convey this message. It may well be that, as a practical matter, even the statement of a more flexible position by plaintiffs would not have resulted in performance of the agreement by defendants; for the matter of determining what repairs were or were not required was not at all pursued by defendants, who, it appears were so concerned about radon that they would have only closed if the level could be reduced to somewhere in the area of.5 pCi/L. But this is a matter of hindsight based on evidence at trial. It does not suffice to show that an attempt by plaintiffs to discuss the matter would not have had some reasonable measure of success.
*234 Thus, the substantial damages resulting to plaintiffs-sellers were not all attributable to defendants' breach. Part of the damages could have been avoided by plaintiffs with reasonable effort and without undue risk or expense, were not necessarily caused by defendants' breach and are not to be charged against them. Had plaintiffs at least minimally endeavored to comply with the intent of the supplemental agreement, there is some prospect that the parties may have arrived at an arrangement and avoided a complete contract cancellation and all of the resulting damage. Williston, Contracts, (3 ed. Jaeger 1957), 1353. See also Stark v. National Research and Design Corp., supra, 33 N.J. Super. at 323, 110 A.2d 143 (in breach of contract cases, plaintiff is under a duty to minimize damages to the extent a prudent person would under the circumstances). It should also be noted that after cancellation of the contract, the Wongs had another radon reading in December 1987, which was 1.8. They did not advise the Mercados of this result.[4]
For plaintiffs' failure in this respect to mitigate or avoid damages, I have determined that their damages should be reduced by 15%. This is a fair and reasonable amount to allow for their own contribution to the damages which they suffered.
I will now address the matter of computing the Wong's damages (apart from the reduction hereafter discussed) proximately resulting from Mercado's breach of contract.
I have considered Mercado's contention that the $200,000 purchase price or the $182,000 resale price should be adjusted because they were either too high or too low based on comparable sales. I have also considered their contention that the $182,000 resale price was low because of the defects found in the home inspection report and that this was reflected in Bigley's negotiations for that price.
Both arguments are rejected. They are not supported by credible evidence and are predicated on speculative inferences *235 which I cannot make. I note that the claimed defects are accounted for in the $500 credit for repairs hereafter allowed defendants.
Additionally, there is no merit in the Mercados' claim that the value at the time of the breach was higher than the Bigley contract price. Apart from other compensatory damages, the measure of damages is the difference between the contract price and the market value thereof at the time of the breach, less a credit for the deposit made on account of the purchase price. Sheehy v. Galipeau, supra, 48 N.J. Super. at 102-103, 137 A.2d 5.
I am satisfied that, predicated on the evidence, and particularly in view of the stock market financial situation and the resulting adverse effect on real estate prices in or about October 1987 and thereafter, the resale to Bigley for $182,000 on April 28, 1988 (which closed on July 20, 1988) represents the market value of the house as of the date of the contract breach  October 29, 1987. The evidence shows that it was made under conditions as favorable as those of the original sale and was made within a reasonable time after defendants unjustifiably nullified the contract. I find that the prima facie evidence of such market value at the time of the breach established by the resale sales price has not been rebutted or overcome by the proofs relied on by defendant. Indeed, this prima facie effect of the sale price is supported by the fact that the Wongs leased the house for six months from January 15, 1988 because no viable sale or offer was forthcoming until the Bigley contract of April 28, 1988.
A proposed computation of the Wong plaintiffs' damages is set forth in an exhibit identified as P20. I have recomputed the amounts allowed, since the date of breach was October 29, 1987, not October 15, 1987.
Of the items listed, items 6 ($408.33 interest paid to second mortgagee Smith), and 11 ($185, other repair expenses) were abandoned by plaintiffs during trial. I am disallowing the following:

*236 (1) $226.24 for maintenance and utilities (items 8 and 9) are damages that were not in the reasonable contemplation of the parties when their contract was executed, since they are the result of the Wongs' purchase, in August 1987, of another house in reliance on the contract's closing, a risk which they had to assume. See Donovan v. Bachstadt, 91 N.J. 434, 444-445, 453 A.2d 160 (1982).
(2) $1,290, the attorney's fee sought for Mr. Schiffman's services, since they are in connection with this action and preparation therefor (part of item 12).
(3) $135 paid for the December 15, 1987 radon test (part of item 12) since it is a test that plaintiffs voluntarily made and should have charged, if at all, to the Bigleys.
(4) $3,537.69, the claimed loss of interest on net proceeds from sale of house to Mercado of $66,406.86 from October 16, 1987 to July 20, 1988 at 7%. This represents a double recovery if, as is the case, I allow interest of $4,436.47 paid to Citibank, the first mortgagee on the premises, from October 29, 1987 to July 20, 1988. If the matter had closed and the proceeds had been received by the Wongs, they would not have had to pay such interest (item 5).
Based on the credible evidence, I find that all of the other items of damage listed on P20 should be awarded to plaintiffs Wong, since they were a proximate result of Mercado's breach.
However, there must be a 15% reduction thereof by reason of the Wongs' contribution to such damages.
These items, calculated for the period October 29, 1987 to July 20, 1988 (when the Bigleys' house closed) are as follows:

 1. Difference between the net proceeds to
 the Wongs on the Mercado sale and the
 resale to Bigley ....................... 16,920.00[(a)]
 2. Interest paid to Citibank ................ 4,436.47
 3. Real Estate Taxes paid to Citibank ....... 1,481.35
 4. Interest paid to second mortgagee, Smith 2,692.50[(b)]
 7. Prorated portion of insurance
 Premiums: (One year was $382.42) ......... 279.30
10. Real Estate Agency Management Fee
 (10%) on lease ......................... 600.00
12. Attorneys Fees paid to Ely for transaction
 with Mercado ........................... 1,221.50
 ___________
 $27,631.12
These damages must be reduced by 15% .......... - 4,144.67
 ___________
 $23,486.45

*237
13. Deductions:
 The $15,000 deposit by the Mercados is
 also an item of damage subject to the 15%
 reduction. Accordingly, the proper
 amount of the deposit which may be retained
 by plaintiff Wongs is $12,750.
 Item 13 must be recomputed as follows:
  Mercado's Deposit ..... ($12,750.00)
  $15,000 Interest Income ... (748.16)
 from 10/29/87 to 7/20/88 at 7%
  Rent Received at
 $1,000/month for six months ... (6,000.00)
 ( $19,498.16)
 3,988.29
13A.  Allowance to the Mercados for repairs,
 as agreed ............................ - 500.00
 ___________
 3,488.29
 ===========

Thus, the amount due to plaintiffs Wong from defendants Mercado is $3,488.29. This is in addition to the $12,750 portion of the deposit which should be paid to the Wongs, which is now held in escrow by Ely. I am rounding off the amount allowed to $3,500 and will enter a judgment therefor plus the $12,750 deposit, or $16,250 in favor of the Wongs.
The last issue to be decided is the claim of the broker, Susan Bingham Realties, Inc., to damages against the Mercados.
As the party liable for the breach of the sales contract, the Mercados are liable to the broker for damages by reason of an *238 implied promise to complete the transaction with the sellers. The Mercados knew that the sales contract called for a broker's commission of $12,000 to be paid by the sellers. They refused to perform that contract without valid reason, thus preventing the broker from earning the commission from the sellers. The Mercados are liable to the broker for breach of this implied promise; and the damages chargeable to them ordinarily would be measured by the $12,000 commission the broker would have earned from the sellers. Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 559, 236 A.2d 843 (1967).
But mitigation of damages is always a matter to be considered where contract damages are in issue, and where the factual complex permits its application.[5]See Sporn v. Celebrity, Inc., 129 N.J. Super. 449, 456, 324 A.2d 71 (Law Div. 1974); Roselle v. LaFera Contracting Co., 18 N.J. Super. 19, 28, 86 A.2d 449 (Ch.Div. 1952). See also White v. Tp. of North Bergen and Sandler v. Lawn-A-Mat, supra, and other cases cited above on damage mitigation.
The broker argues that mitigation is not applicable to the facts here. It contends that, although it received a $5500 commission on the resale to Bigley, that is a separate transaction and the defaulting defendants are not entitled to any credit or benefit for the amount so received. It points to cases which, on the surface, appear to limit damage mitigation to personal service or employment contracts or where the subject matter of the contract remains in, or comes into, the possession of plaintiff and without due diligence on his part additional damages may result.
But, as Sandler pointed out, the mitigation rule is not necessarily so limited, although it is "particularly applicable to an employment contract." It applies to breach of contract cases *239 "provided the factual complex permits its application." Sandler, supra, 141 N.J. Super. at 455, 358 A.2d 805. Each of the cases cited by the broker, as well as other cases denying mitigation, are factually distinguishable from the instant case. In those cases essentially mitigation was denied because: (1) the matter involved profits on another contract by plaintiff, after the breach by defendant, usually with a different person; or (2) such profits were not readily ascertainable; or (3) such profits or payments received by plaintiff were not proximately related to defendant's breach; or (4) defendant, under its contract, could engage in other duties. In short, the situation or facts in the case were such that it would be unfair to plaintiff to charge it with a duty to mitigate damages to the benefit of the defaulting defendant.[6]
But in the present case the same house was listed by the broker for resale for the same seller, and it received part of the commission therefor; profits as such are not involved, and the matter of determining the actual loss in commissions to the broker is readily ascertainable. Further, the resale and commission received thereon, are directly and proximately related to defendant's breach and are a necessary consequence thereof. The receipt of the $5500 commission on the second sale did not result from any other intervening or independent cause. See, Olds, cited in n. 8 below, 58 N.E. at 479. To charge defendants with the full $12,000 commission under these circumstances would be basically unfair to defendants and would violate the "broad purposes of reparation" as the guiding principle in determining compensatory damages. See Donovan v. Bachstadt, supra, 91 N.J. at 445, 453 A.2d 160.
Thus, defendants, at most, would be liable for $6,500 ($12,000  $5,500) to the broker.
*240 The question arises as to whether the broker's damage recovery against the Mercados should be reduced by 15%  the degree of contribution by the Wongs to the extent of their own damages. To do so is, however, to confuse the issue of contribution by the sellers to the amount of damages they suffered with quite a different issue not involved herein  the comparative degree by which each party to the contract has breached its duty thereunder. In any event, even if the Wongs may be deemed to have contributed to their broker's damages by their conduct, the broker would have to look to them for that portion of such damages. This would be unfair to both the broker, who has not asserted any such claim here, and to the Wongs. For, in computing the Wong's damages due from the Mercados, the respective commissions payable or paid by the Wongs on the two sales have already been taken into account.
It is basically the Mercados' breach of contract in cancelling it that proximately caused the broker's damages. Under the circumstances of this case, I am satisfied that an award of damages against the Mercados in favor of the broker in the sum of $6,000 is fair and just. This gives due consideration to the Wongs' contribution to such damages by allowing the Mercados a $500 credit.
A judgment is being entered today against the Mercados as follows:
(1) In favor of the Estate of Steven Wong and Doris Wong for $16,250 (including the $12,750 of the $15,000 held in escrow by Ely);[7]
(2) In favor of the broker, Susanne Bingham Realties, Inc. for $6,000.
*241 No costs or prejudgment interest will be allowed to any party.
Endnotes from pp. 236, 237.
NOTES
[1] Plaintiffs' expert, Henry Shotwell, disputed the correctness of the lung cancer estimate in the chart. But he supported the statement that reductions of levels of 4 or below would not realistically reduce the risks to health. He did not consider 2.9 pCi/L as a true health hazard. Indeed, he stated, to recommend repair or remediation at that level would be fraud on the homeowner.
[2] To the extent this letter relies on the original contract provision relating to inherent defects in the premises as a basis for voiding the contract, it is plainly erroneous for a number of reasons, among which is the fact that the supplemental agreement specifically dealing with radon supplanted the more general home inspection provisions of the original contract.
[3] Even if I were to accept Mrs. Mercado's testimony that she informed the broker Terry Bohan of this use of the basement, she did not advise him of this in the context of any radon concerns.
[4] A somewhat similar principle applies in tort cases with respect to apportioning damages, based on the degree of fault in assessing responsibility for such damages. See Dziedzic v. St. John's Cleaners, et als., 53 N.J. 157, 161-166, 249 A.2d 382 (1969).
[5] Defendants also have the burden of proving actual or potential mitigation and the amount thereof. This burden has been satisfied here.
[6] See, for example, Frank Stamato & Co. v. Borough of Lodi, 4 N.J. 14, 71 A.2d 336 (1950); Roselle v. LaFera Contracting Co., 18 N.J. Super. 19, 86 A.2d 449 (Ch.Div. 1952); Sandler v. Lawn-A-Mat Chem. & Equip. Corp., 141 N.J. Super. 437, 358 A.2d 805 (App.Div. 1976); Louisiana Sulphur Car v. Gulf Resources & Chem. Corp., 53 F.R.D. 458 (D.C.Del., 1971). Grinnell v. Voorhees, 1 F.2d 693 (3 Cir.1924), cert. den. 266 U.S. 629, 45 S.Ct. 195, 69 L.Ed. 477 (1924); Olds et al. v. Mapes-Reeves Const. Co., 177 Mass. 41, 58 N.E. 478 (Sup.Jud.Ct. 1900).
[7] Ely should pay the balance of the escrowed $15,000 to the Wongs in partial satisfaction of their judgment.

(a) This amount is determined as follows:

 Difference between net sales proceeds:
 Contract with Mercado dated 7/15/87 $200,000.00
 Less: Real Estate Broker's
 Commission (6%) 12,000.00
 ____________
 Net Sales: 188,000.00
 New Contract with Bigley, closing
 7/20/88 $182,000.00
 Less: Real Estate Broker's Commission (6%) $ 10,920.00
 ____________
 Net Sales: $171,080.00 $16,920.

(b) With respect to the Smith second mortgage, ordinarily there would be no recovery for the interest paid thereon. The August 1987 purchase of a new house by the Wongs and the resulting bridge loan from Smith to finance it in reliance on a closing under Mercado's contract cannot be said to have been within the reasonable contemplation of both parties at the time they made the earlier July contract. See Donovan v. Bachstadt, 91 N.J. 434, 444-445, 453 A.2d 160 (1982). But here, the Mercados knew at the time of the October 16, 1987 escrowed closing that there was second mortgage to Smith in the amount of at least $55,000. The escrow closing statement of that date shows an adjustment in favor of buyers of $55,806.82.