275 N.J. Super. 241 (1994)
645 A.2d 1248
ERNEST ALLEN COHEN, PLAINTIFF-RESPONDENT/CROSS-APPELLANT,
v.
RADIO-ELECTRONICS OFFICERS UNION, DISTRICT 3, NMEBA, AFL-CIO, DEFENDANT-APPELLANT/CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 31, 1994.
Decided July 28, 1994.
*244 Before Judges PETRELLA, BAIME and VILLANUEVA.
Ira R. Mitzner of the Washington, D.C. Bar, admitted pro hac vice, argued the cause for appellant (Zazzali, Zazzali, Fagella & Nowak, attorneys; Mr. Mitzner and Kenneth I. Nowak, on the brief).
Samuel N. Reiken argued the cause for respondent (Lillick & Charles, attorneys; Mr. Reiken and Linda P. Torres, on the brief).
The opinion of the court was delivered by PETRELLA, P.J.A.D.
*245 The significant issue on this appeal is whether a renewable one-year agreement for legal services between an attorney and his client is governed by general contract principles or those principles as modified by ethical considerations and standards applicable to the practice of law as a profession. The subject agreement between the parties has elements of a non-refundable retainer agreement as it can only be canceled by notice within a restrictive thirty-day period, i.e., not less than six nor more than seven months before the start of the next one-year period.[1]
Defendant Radio-Electronics Officers Union, District 3, NMEBA, AFL-CIO (ROU) appeals from a monetary judgment enforcing a notice provision of a one-year renewable contract for legal services in favor of plaintiff Ernest Allen Cohen. Cohen, an attorney admitted to practice law in New York, New Jersey, and Arizona, cross-appeals contending that the judge inappropriately applied the doctrine of mitigation of damages and miscalculated certain set-off amounts.
We conclude that the subject contract for legal services, which only permitted "proper" termination of counsel within a limited one-month period and is essentially an agreement for a nonrefundable retainer fee, violates public policy and our Rules of Professional Conduct (RPC) as it infringed upon the client's inherent right to discharge his attorney at will, foisted an unwanted attorney upon a client who lost faith and confidence in his services, and provided for the payment of a contract fee regardless of whether the attorney actually performed any professional legal services.

*246 I.
ROU, a labor organization, represents radio officers who are responsible for the communications and electronics aboard ocean-going vessels. Together with employer contributions, it funds various affiliated plans and trusts, which are considered separate entities, to provide medical, vacation, and other benefits to its members.
In December 1985, Thomas C. Harper, then secretary-treasurer of ROU, sought legal services from Cohen, who at that time was a partner in the New York firm of Marchi, Jaffe, Cohen, Crystal, Rosner & Katz (Marchi firm). On January 4, 1986, the Marchi firm and ROU (then based in Jersey City, New Jersey) entered into a contract wherein the parties agreed upon $150 per hour as the highest hourly rate for legal services. In 1986 and 1987, the Marchi firm provided ROU about 1,300 or 1,400 hours in legal services.
In March 1987, Cohen decided to relocate to Arizona and leave the Marchi firm for personal reasons. Shortly thereafter he told Harper, then president of ROU, of his plans. According to Harper, Cohen stated that he wanted to take a few clients with him, including ROU, and practically begged him to be general counsel instead of the Marchi firm.
Cohen on the other hand stated that he told Harper of an offer that he had to teach as an adjunct associate professor at the University of Arizona School of Law. Although Cohen foresaw the possibility of teaching on a full-time basis in the future, he did not apply for this position in 1988, nor was he certain about his future plans. Cohen, however, apparently told Harper that he would have to notify the law school in June of any year in which he wanted the University to consider him for a full-time position. Cohen further claims that Harper initiated the offer to keep him as general counsel and, although he had reservations, he believed it could work given his intention to retain of-counsel status at the Marchi firm.
*247 Although both sides presented conflicting testimony with regard to the actual drafting and signing of the April 28, 1987 agreement, we need not recount those differences. Suffice it to say, ROU and Cohen entered into a one-year agreement, effective January 1, 1988, whereby Cohen would act as general counsel for ROU after he relocated to Arizona.[2] The parties "negotiated and executed [the agreement] in New Jersey with reference to New Jersey law" and, on this appeal, neither party contests the application of New Jersey law.
According to its terms, the agreement automatically renewed itself each year unless either party provided "written notice of termination on a date in any year not less than six (6) months nor more than seven (7) months after the commencement month...." Put simply, the termination notice had to be given during June of the year preceding the termination date.
The parties agreed that the annual compensation shall be $100,000 for 1,000 hours of service. ROU also agreed that it would seek to have Cohen designated co-counsel for all applicable ROU trusts and plans[3] and, further, any compensation received by Cohen from those plans or trusts would entitle ROU to additional hours of service at the rate of one hour per $100 of compensation. The agreement also permitted Cohen to charge $150 per hour for any time in excess of 1,000 hours, excluding the additional time for the plans.
Cohen in addition had to be "available during ROU's regular business hours for consultation by phone within 24 hours of any call from ROU to Cohen." If ROU identified the call as "on an emergency basis," Cohen had to "be available [by phone] during regular business hours within 3 hours." Alternatively, if Cohen was "unavailable due to illness, vacation or other legitimate *248 cause," he had to provide "appropriate substitute coverage for ROU" at his own cost.
In January 1988, Cohen started to submit invoices with regard to his dual representation of the plans and ROU, including "the amount of time [he] spent on matters of interest to the ROU." According to David Tipton, an ROU auditor, Cohen completed 550 hours of service in 1988 and 1,003 hours in 1989 for ROU. Tipton also determined that Cohen should have reimbursed ROU for $8,079 it had already paid the Marchi firm for legal services.
On December 10, 1989, Harper advised Cohen that the trustees for the plans had decided to replace him as co-counsel and, on December 28, Harper notified Cohen of his termination, effective January 1, 1990, as general counsel for ROU. At that point, Cohen had been fully paid (except for three hours) for legal services rendered through December 31, 1989, but ROU refused to pay him an additional $100,000 for 1990.
Cohen thereafter filed a complaint seeking damages for termination of the legal services agreement without proper notice. More specifically, he sought $100,000 for 1990 based on the failure to comply with the notice provision contained in the agreement and $75,000 for reasonably anticipated fees from ROU related trusts and plans.
In its answer, ROU contended that the contract was not enforceable because (1) Cohen did not advise Harper and ROU to seek independent counsel prior to signing the agreement; (2) certain provisions of the agreement violated the law and were unreasonably advantageous to Cohen; (3) the Rules of Professional Conduct barred a suit arising out of an attorney discharge; and (4) even if the Rules of Professional Conduct did not apply, ROU terminated their agreement with Cohen for cause.[4] ROU in addition counterclaimed, asserting breach of contract, misrepresentation with regard to billings, and malpractice.
*249 After an eight-day trial, the trial judge rendered his oral decision on May 4, 1993, which he later supplemented with a May 12 letter. In his decision, the judge essentially construed the agreement under general contract principles and concluded that ROU had to provide appropriate advance notice to terminate its agreement with Cohen. The judge did not find the six-month advance notice provision unreasonable or unfair because the University of Arizona made faculty hiring decisions in June each year and ROU had Cohen at its "beck and call" to travel all over the country, sometimes on short notice. Nor did the judge interpret RPC 1.16 (terminating representation) as precluding Cohen from maintaining a breach of contract action and, further, stated that there were "no New Jersey appellate decisions which render all actions by attorneys for wrongful termination unenforceable."
Although the trial judge determined that the parties properly entered into a fair and reasonable agreement, he found illegal the clause providing ROU a one hour credit for each $100 received by Cohen from the trusts or plans.[5] The judge stated that Cohen and Harper both "breached their respective duties as co-counsel and trustee to the plans ... in including that provision in their retainer agreement." Notwithstanding the illegality of this provision, the judge determined that the other compensation provisions contained within the agreement were severable and enforceable.
After determining the enforceability of the agreement, the judge rejected ROU's claim that it had discharged Cohen for cause as pretextual and exaggerated. We find no reason to detail the respective claims of either side here or disturb the trial judge's findings regarding them. Although there is a sufficient basis in the record to support his findings, Rova Farms Resort, Inc. v. Investors Ins. Co. of America, 65 N.J. 474, 484, 323 A.2d 495 (1974), they are irrelevant to our decision.
*250 The trial judge then awarded Cohen damages in the amount of $50,000 for the period between January and June 1990 based on his determination that Cohen had a duty to mitigate damages. As Cohen knew of his termination in December 1989, the trial judge reasoned that he had time to secure alternative employment and, indeed, did procure other clients. The judge also denied Cohen damages for monies he could have earned as co-counsel to the trusts and plans because he did not attribute the trustees' termination of Cohen to ROU. And, finally, the judge stated that ROU was entitled to a set-off in every other respect. He initially calculated a set-off of $19,579, yielding an award to Cohen of $30,871,[6] but later issued a supplemental letter opinion on May 12, 1993 (as a result of additional correspondence from the parties) correcting the set-off amount to $45,565. The judge therefore entered a judgment in favor of Cohen and against ROU for $4,885.
On appeal, ROU essentially asserts that (1) the trial judge erred in enforcing the subject agreement because Cohen did not provide any legal services in 1990 nor did he detrimentally rely upon it; (2) the trial judge wrongfully enforced an agreement containing an illegal provision; (3) even assuming ROU could only terminate Cohen for good cause, it properly did so based upon Cohen's improper legal advice and billing practices; and (4) the trial judge should not have relied upon certain evidence in characterizing ROU's arguments for good cause as pretextual. On his cross-appeal, Cohen basically complains that the trial judge improperly imposed the doctrine of mitigation of damages and miscalculated the set-off amounts.

II.
The precise issue for us to decide is whether a one-year legal services agreement, which is automatically renewable each year, absent six months' notice, and contains a fixed yearly sum irrespective *251 of whether the attorney performs legal services, is controlled by general contract principles or is it a special agreement subject to appropriate ethical and disciplinary rules imposed by our Supreme Court.
We start with the well settled principle that transactions between an attorney and a client are subject to close scrutiny by the court and "the burden of establishing fairness and equity of the transaction rests upon the attorney." Matter of Gallop, 85 N.J. 317, 322, 426 A.2d 509 (1981); Matter of Humen, 123 N.J. 289, 300, 586 A.2d 237 (1991); Matter of Harris, 115 N.J. 181, 187, 557 A.2d 657 (1989); Matter of Nichols, 95 N.J. 126, 131, 469 A.2d 494 (1984). It is also well established that an attorney "is required to maintain the highest professional and ethical standards in his dealings with clients[,]" Humen, supra, 123 N.J. at 299-300, 586 A.2d 237 (citing In re Gavel, 22 N.J. 248, 262, 125 A.2d 696 (1956)), and "should refrain from engaging in a business transaction with a client who has not obtained independent legal advice on the matter." Humen, supra, 123 N.J. at 301, 586 A.2d 237 (citing In re Barrett, 88 N.J. 450, 453, 443 A.2d 678 (1982)). See Matter of Smyzer, 108 N.J. 47, 55, 527 A.2d 857 (1987). Hence, "a passing suggestion that the client consult a second attorney" will not even "discharge the lawyer's duty when he and his client have differing interests." Smyzer, supra, 108 N.J. at 55, 527 A.2d 857.
ROU relies on RPC 1.5(a) for the proposition that a lawyer may only charge reasonable fees. It claims that the judgment in favor of Cohen basically grants him an unreasonable fee because he failed to perform any services whatsoever for 1990. RPC 1.5(a) indeed states that "[a] lawyer's fee shall be reasonable." The factors to consider in determining whether a fee is reasonable include: the time and skill required; the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; the time limitations imposed by the client or circumstances; the nature and length of the professional relationship with the client; and the experience, *252 reputation, and ability of the lawyer or lawyers performing the services. RPC 1.5(a)(1)-(8).
We are also aware of Opinion 644 of the Advisory Committee on Professional Ethics (reported at 126 N.J.L.J. 966, October 11, 1990),[7] which discussed non-refundable retainers and concluded that they are "not unethical per se but are subject always to the overriding precept that any fee arrangement must be reasonable and fair to the client." Although the Advisory Committee did not adopt the Ad Hoc Committee's recommendation to condition the deposit of a non-refundable retainer upon compliance by the attorney with a specific set of requirements, it stated:
[W]e concur fully with the Committee's view that an initially reasonable nonrefundable retainer arrangement may become unreasonable because of subsequent unforeseen circumstances, such as the sudden death of a client resulting in an abatement of the action. Clearly the unused portion of even a nonrefundable retainer should be returned if contravening events should render it unconscionable for the attorney to keep it.
A non-refundable retainer agreement obviously affects the willingness and ability of a client to discharge his attorney at any time. Although there is a dearth of New Jersey case law addressing the enforceability of non-refundable retainer agreements and, for that matter, the precise issue involved here, In re Estate of Poli, 134 N.J. Super. 222, 338 A.2d 888 (Cty.Ct. 1975), offers some guidance. There, the court concluded that an attorney, who does not complete his services, does not have a vested right in the contractual relationship with a client arising out of a contingent fee arrangement because the client may discharge him at any time without cause. Id. at 226, 338 A.2d 888. If discharged, the attorney should refund the client any advanced payment of fees that he has yet to earn. Id. at 225-226, 338 A.2d 888. See RPC 1.16(d) (upon termination, an attorney shall take steps to the extent reasonably practicable to refund any advance payment of a fee that has not been earned). The Poli court, however, also reasoned that a client cannot deprive a lawyer of his right to *253 compensation for services already rendered. Id. at 226-227, 338 A.2d 888 (citations omitted).
We agree with the Poli court that an attorney is not a businessman "`entitled to charge what the traffic will bear[,]'" but rather is entitled to quantum meruit, i.e., "`as much as he reasonably deserved to have for his labor.'" Poli, supra, 134 N.J. Super. at 225, 338 A.2d 888 (quoting American Trial Lawyers Ass'n v. New Jersey Supreme Court, 126 N.J. Super. 577, 591, 316 A.2d 19 (App.Div.), aff'd, 66 N.J. 258, 330 A.2d 350 (1974), and Black's Law Dictionary (4th ed. 1951)). And, further, "[a]ttorneys must never lose sight of the fact that `the profession is a branch of the administration of justice and not a mere money-getting trade.'" Kriegsman v. Kriegsman, 150 N.J. Super. 474, 480, 375 A.2d 1253 (App.Div. 1977) (quoting Canons of Professional Ethics, No. 12).
Other jurisdictions have applied similar reasoning with regard to non-refundable retainer agreements. Most recently, in In the Matter of Cooperman, 83 N.Y.2d 465, 473-474, 611 N.Y.S.2d 465, 468-469, 633 N.E.2d 1069, 1070 (1994), the New York Court of Appeals stated:
[W]e hold that the use of a special nonrefundable retainer fee agreement clashes with public policy because it inappropriately compromises the right to sever the fiduciary services relationship with the lawyer. Special nonrefundable retainer fee agreements diminish the core of the fiduciary relationship by substantially altering and economically chilling the client's unbridled prerogative to walk away from the lawyer. To answer that the client can technically still terminate misses the reality of the economic coercion that pervades such matters. If special nonrefundable retainers are allowed to flourish, clients would be relegated to hostage status in an unwanted fiduciary relationship  an utter anomaly. Such circumstance would impose a penalty on a client for daring to invoke a hollow right to discharge.
Without question the relationship between lawyer and client is both extremely delicate and personal. "There are few of the business relations of life involving a higher trust and confidence than that of attorney and client ... [and] few more anxiously guarded by the law, or governed by sterner principles of morality and justice...." Matter of Education Law Center, Inc., 86 N.J. 124, 133, 429 A.2d 1051 (1981) (quoting In re Loring, 73 N.J. 282, *254 290, 374 A.2d 466 (1977)). See Karlin v. Weinberg, 77 N.J. 408, 418-419, 390 A.2d 1161 (1978) (in light of the unique relationship between attorney and client, ordinary commercial standards are inapplicable in determining the enforceability of lawyer restrictive covenants); Dwyer v. Jung, 133 N.J. Super. 343, 347, 336 A.2d 498 (Ch.Div.) (attorney-client relationship is consensual, highly fiduciary on the part of counsel, and he may not do anything that restricts the right of the client to repose confidence in any counsel of his choice), aff'd o.b., 137 N.J. Super. 135, 348 A.2d 208 (App.Div. 1975).
The Cooperman Court also recognized the special nature of the attorney-client employment situation, when it stated:
This unique fiduciary reliance, stemming from people hiring attorneys to exercise professional judgment on a client's behalf  "giving counsel"  is imbued with ultimate trust and confidence. The attorney's obligations, therefore, transcend those prevailing in the commercial market place. The duty to deal fairly, honestly and with undivided loyalty superimposes onto the attorney-client relationship a set of special and unique duties, including maintaining confidentiality, avoiding conflicts of interest, operating competently, safeguarding client property and honoring the clients' interest over the lawyer's. [Cooperman, supra (83 N.Y.2d at 472, 611 N.Y.S.2d at 467, 633 N.E.2d at 1070) (citations omitted).]
Our current Rules of Professional Conduct, see RPC 1.5 (fees) and RPC 1.16 (terminating representation), are indeed similar to New York's disciplinary rules, which state that an attorney "shall not enter into an agreement for, charge or collect an illegal or excessive fee" (DR 2-106[A]) and, upon withdrawal from employment, "shall refund promptly any part of a fee paid in advance that has not been earned." (DR 2-110[A][3]).[8]
There can be little doubt that "[o]ur Supreme Court has the exclusive constitutional responsibility as to admission to the bar, the practice of law, the conduct of attorneys and the attorney-client relationship." Taylor v. Hoboken Bd. of Educ., 187 N.J. Super. 546, 553, 455 A.2d 552 (App.Div.) (citing N.J. Const. art. VI, § II, ¶ 3 (1947)), certif. denied, 95 N.J. 228, 470 A.2d 441 (1983). *255 This is particularly so with concern to the amount of fees an attorney could charge a client and terms by which a client may engage a lawyer to render professional legal services. Thus, whether or not a client employs a lawyer for a particular period of time, it has long been established that this very same client could terminate the relationship at any time with or without cause. RPC 1.16(a)(3). See DeBolt v. Parker, 234 N.J. Super. 471, 485, 560 A.2d 1323 (Law Div. 1988) (RPC 1.16(a) requires lawyer to withdraw when discharged); Buckelew v. Grossbard, 189 N.J. Super. 584, 587, 461 A.2d 590 (Law Div.) (an attorney may be discharged at any time by his client), aff'd o.b., 192 N.J. Super. 188, 469 A.2d 518 (App.Div. 1983); Poli, supra, 134 N.J. Super. at 226-227, 338 A.2d 888 (client has absolute right to discharge his attorney and can terminate the relationship with or without cause at any time); 10 Samuel Williston, A Treatise on the Law of Contracts, § 1285A at 919 (3d ed. 1961) (most courts hold that client has absolute right to discharge attorney at any time with or without cause). But compare Pillsbury v. Board of Chosen Freeholders of Monmouth County, 140 N.J. Super. 410, 412-413, 356 A.2d 424 (App.Div. 1976) (statutory provision providing term of service prohibits board of chosen freeholders from discharging county counsel without cause) with Taylor, supra, 187 N.J. Super. at 559, 455 A.2d 552 (disciplinary rule to withdraw when discharged took precedent over legislative grant of tenure) and Parker v. M & T Chemicals, Inc., 236 N.J. Super. 451, 460, 566 A.2d 215 (App.Div. 1989) (discharged in-house attorney had a cause of action seeking money damages for wrongful discharge under Whistle Blower's Act). See also Battaglia v. Union County Welfare Bd., 88 N.J. 48, 67, 438 A.2d 530 (1981) (party affiliation was an appropriate requirement for the effective performance of legal assistant to county welfare board and, as such, could be considered in non-renewal of employment contract), cert. denied, 456 U.S. 965, 102 S.Ct. 2045, 72 L.Ed.2d 490 (1982). Of course, it need hardly be said that an attorney is entitled to reasonable compensation for the work and effort he expended on the client's *256 behalf up to the point of discharge, particularly where no cause exists for the termination.

III.
In addition to the rationale employed in Cooperman, supra, we view cases from other jurisdictions involving the so-called "modern rule" with regard to contingent employment contracts as supporting the proposition that Cohen is only entitled to recover quantum meruit, i.e., the reasonable value of his services. We base this conclusion upon the distinct and special nature of the attorney-client relationship and overriding need to allow clients the freedom to substitute counsel without fear of economic penalty as a means of achieving the broad objective of fostering public confidence in the legal profession.
The New York Court of Appeals first enunciated the modern rule in Martin v. Camp, 219 N.Y. 170, 114 N.E. 46 (1916), wherein it stated:
That the client may at any time for any reason or without any reason discharge his attorney is a firmly established rule which springs from the personal and confidential nature of the relation which such a contract of employment calls into existence. If the client has the right to terminate the relationship of attorney and client at any time without cause, it follows as a corollary that the client cannot be compelled to pay damages for exercising a right which is an implied condition of the contract. If in such a case the client can be compelled to pay damages to his attorney for the breach of the contract, the contract under which a client employs an attorney would not differ from the ordinary contract of employment. In such a case the attorney may recover the reasonable value of the services which he has rendered, but he cannot recover for damages for the breach of contract. The discharge of the attorney by his client does not constitute a breach of the contract, because it is a term of such contract, implied from the peculiar relationship which the contract calls into existence, that the client may terminate the contract at any time with or without cause. [Id. 114 N.E. at 48 (citation omitted)]
See also Plaza Shoe Store, Inc. v. Hermel, Inc., 636 S.W.2d 53, 58 (Mo. 1982) (modern rule strikes a better balance between the client's power to discharge his attorney without undue restrictions and attorney's right to fair compensation for services rendered); Rosenberg v. Levin, 409 So.2d 1016, 1021 (Fla. 1982) (an attorney discharged without cause under either a fixed or contingent fee *257 contract of employment is entitled to the reasonable value of his services on the basis of quantum meruit, but recovery is limited to the maximum fee set in the contract); Covington v. Rhodes, 38 N.C. App. 61, 247 S.E.2d 305, 308 (1978) (modern trend only allows an attorney discharged with or without cause to recover reasonable value of his services as of that date), rev. denied, 296 N.C. 410, 251 S.E.2d 468 (1979); Fracasse v. Brent, 6 Cal.3d 784, 100 Cal. Rptr. 385, 389, 494 P.2d 9, 13 (1972) (right of client to discharge an attorney at any time with or without cause does not constitute a breach of contract because such a right is implied by law into the agreement by reason of the special relationship between the contracting parties); Cole v. Myers, 128 Conn. 223, 21 A.2d 396, 399 (1941) (a lawyer is only entitled to reasonable compensation for the work done up to the point of discharge, even if terminated without just cause, because of the highly confidential relationship between an attorney and a client).
Other jurisdictions follow the traditional view, which permits an attorney discharged without cause to recover damages for breach of contract under traditional contract principles. See, e.g., Tonn v. Reuter, 6 Wis.2d 498, 95 N.W.2d 261, 265 (1959) (proper measure of damages for an attorney discharged without cause is the contingent fee based upon the amount of judgment ultimately realized by the client); Bockman v. Rorex, 212 Ark. 948, 208 S.W.2d 991, 994-995 (1948) (attorney dismissed without cause had right to recover fixed fee). Support for the traditional view is based upon: (1) the full contract price arguably offers the most logical measure of damages as it reflects the value that the contracting parties placed on the services; (2) charging the full fee prohibits a client from profiting from his own breach of contract; and (3) ameliorating the difficult task of valuing a lawyer's partially completed work. Rosenberg, supra, 409 So.2d at 1019-1020.

IV.
Although we recognize that an attorney could maintain a viable suit against an employer concerning damages for wrongful *258 discharge in particular situations, see, e.g., Parker, supra, 236 N.J. Super. 451, 566 A.2d 215 (involving in-house attorney and employer-employee relationship), we are convinced that the agreement entered into here prohibiting termination absent notice within a restrictive thirty-day period is most analogous to a nonrefundable retainer agreement and infringes upon a client's well established right to discharge his attorney at any time with or without cause; thus, it is unreasonable and unenforceable as against public policy.[9]
In fact, we consider the contract in dispute quite similar to the non-refundable retainer agreement rejected by the New York Court of Appeals in Cooperman. Notwithstanding that Cooperman arose in the context of disciplinary proceedings instituted against an attorney by former clients, we find the reasoning employed there persuasive and in accord with what we perceive to be the spirit and intent of the Rules of Professional Conduct as adopted by our Supreme Court.[10]
We do not distinguish Cooperman because it was decided under that state's disciplinary rules, nor do we discuss whether the action of Cohen in this case violates our Rules of Professional Conduct. We have been told that disciplinary proceedings have been instituted with regard to some aspects of this matter, particularly *259 concerning whether Cohen should have escrowed ROU funds rather than commingling them in his account, but have been held in abeyance pending the conclusion of this appeal. Hence, further pronouncements in this area may be anticipated.
Nor do we discern any sound basis to distinguish the public policy factors and ethical underpinnings that support the modern view regarding contingent employment contracts, but rather we find them equally persuasive when applied to the subject agreement. To put the point somewhat differently, we see no reason why these same policy factors and ethical considerations should not apply here to invalidate the one-year renewable agreement between ROU and Cohen for 1990,[11] especially where he received notice of termination prior to the start of 1990.
In light of the unique and special relationship between an attorney and a client, ordinary contract principles governing agreements between parties must give way to the higher ethical and professional standards enunciated by our Supreme Court.[12] A contract for legal services is not like other contracts. To allow *260 Cohen entitlement to $100,000[13] for 1990 (the amount sought without regard to set-offs, mitigation, or the plans) after ROU terminated him prior to his rendering of any legal services whatsoever, and knowing he would not be called on by ROU for any such services, is unconscionable and contravenes the essence of our Rules of Professional Conduct. It indeed cannot fairly be said that this amount is reasonable, whether or not he assertedly was to make himself available,[14]see RPC 1.5(a), particularly when viewed in the context that the legal profession is not a mere money-getting trade, but a learned profession engaged in the administration of justice. So too, payment to Cohen would run afoul of his obligation to refund promptly any part of a fee paid in advance that he had not earned. RPC 1.16(d).
More importantly, the restrictive termination clause here would have in effect caused ROU to continue to retain an attorney it no longer wanted and created an impermissible chilling effect upon its inherent right to discharge Cohen at will. Some might argue that although a client has an absolute right to discharge an *261 attorney without cause at any time, the client should still pay the contract price. We reject this notion.
In a variety of contexts, New Jersey has very carefully preserved the right of a client to discharge an unwanted attorney with or without cause. The client's right to terminate at will is not a breach of contract but a contract term implied by law based upon the special relationship of trust and confidence between attorney and client. The right to discharge without cause is of little value if the client must pay the entire contract price for services not rendered.[15] The client in fact might have to continue "employment" of an attorney in whom he has lost faith and, in addition, pay for the services of yet another attorney. Thus, for instance, if ROU provided notice in July 1989 to terminate its agreement as of January 1, 1990, Cohen could conceivably claim fees for an additional six months in 1989 and twelve months in 1990, regardless of whether he performed any legal services and despite ROU's right to terminate him at any time with or without cause.[16]
In sum, an attorney, who in essence entered into a non-refundable retainer agreement, may recover only the reasonable value of his services for the period in dispute as of the date of discharge. Our Rules of Professional Conduct and public policy disfavor allowing Cohen to recover the full fee for 1990 without *262 providing any legal services as this would render ROU's inherent right to discharge him at will meaningless and foist an unwanted attorney upon ROU. In so holding, we balance the right of the attorney to recover for services he provided with the policy of instilling public confidence in the members of an honorable profession whose relationship to clients is personal and confidential.

V.
In view of our determination that the subject agreement is unenforceable, we need not consider further the arguments raised concerning the trial judge's application of mitigation principles or whether the record supports his findings. Suffice it to say that mitigation is always an element in a contract suit for damages, see Sandler v. Lawn-A-Mat Chemical & Equipment Corp., 141 N.J. Super. 437, 455, 358 A.2d 805 (App.Div.), certif. denied, 71 N.J. 503, 366 A.2d 658 (1976), with the burden of proving facts in mitigation of damages resting upon the party breaching the contract. Roselle v. La Fera Contracting Co., 18 N.J. Super. 19, 28, 86 A.2d 449 (Ch.Div. 1952).
Finally, we disagree with the total set-off amount calculated by the trial judge. Although ROU never paid Cohen anything above the basic $100,000 retainer fee for 1988 and 1989, the trial judge allowed ROU a set-off of monies paid to Cohen for services rendered to its affiliated trusts and plans. ROU had agreed to pay Cohen $100,000 regardless of the hours actually worked, unless they exceeded 1,000 hours. Hence, any fees paid by the plans, which are separate and distinct entities, are irrelevant with regard to the amount ROU had to remunerate Cohen for 1988 and 1989. In essence, the trial judge endeavored to allow ROU to recover $100 for every hour billed by Cohen to the plans, even though the plans are separate entities and Cohen distinctly differentiated between his time spent on the plans as opposed to time for ROU.
Cohen, however, did concede at trial and before us that he owed ROU a $8,079 set-off amount for funds it had previously paid to *263 the Marchi firm. In addition, it is undisputed that Cohen was unpaid for three hours of legal service in 1989. Accordingly, we set aside the judgment in his favor and remand with direction to enter a judgment in favor of ROU against Cohen for $8,079, less compensation for the three hours.
We reverse and remand to the Law Division for entry of a judgment in accordance with this opinion.
BAIME, J.A.D., concurring.
I agree with the views expressed by Judge Petrella. Contrary to the concurring and dissenting opinion, we do not hold that all retainer agreements are unethical and void ab initio. Instead, we conclude that the lengthy notice and automatic renewal provision at issue in this case exacts far too great a penalty upon the client's right to discharge its attorney without cause.
The issue must be considered in a broader setting. It is a sad fact that the legal profession is viewed with suspicion by a substantial segment of the public. If their pronouncements are to be believed, many no longer distinguish between the noblest profession and the oldest profession. It is important to note that the problem is not merely one of image. Nor is it confined to lay people. The common lament among many experienced lawyers is that ideals and values have been replaced with stratagems and tactics, and craftiness and profit are now the lords of the profession. Perhaps this is too harsh a judgment, but the fact remains that it is held by many.
The lawyer-client relationship is the heart and soul of the profession. The sanctity of that relationship must be protected. Sound legal advice or advocacy serves public ends and rests on an open atmosphere of trust between lawyer and client. To foist an unwanted attorney upon a client can only lead him to believe that the law contrives against him. Our ethical rules thus permit a client to discharge his attorney at will and without cause.
*264 Against this backdrop, I believe that the notice and automatic renewal provision at issue here has a chilling effect upon the client's ability to terminate its attorney. The clause subjects the client to draconian damages in the event it exercises its right to discharge its lawyer and seek counsel of its choice. Moreover, I do not believe that the discharged attorney's duty to mitigate damages in the event of a breach of the retainer agreement sufficiently protects the client against the exaction of what amounts to a contractual penalty. Indeed, the concurring and dissenting judge's conclusion that plaintiff satisfied his duty to mitigate or that defendant failed to prove the contrary discloses vividly the shallowness of this remedy. Under that judge's view, plaintiff is to be given a one year paid vacation.
Undoubtedly, a retainer for a fixed fee requires an attorney to stand ready to provide the anticipated representation whether or not it actually materializes. It is equally true that a lawyer has a legitimate interest in being compensated for breach of a retainer agreement and that quantum meruit may not always be sufficient. In appropriate circumstances, out-of-pocket losses and other special damages may perhaps be recovered. Here, however, plaintiff seeks the full amount of the stipulated retainer without having devoted a scintilla of effort or expended an hour of work. This case thus starkly pits the rights of the lawyer against those of his client. In my view, the tension between these competing interests can best be alleviated by recognizing the paramountcy of the right of the client to discharge its attorney without cause. I thus join in Judge Petrella's view that the retainer agreement is unenforceable as against public policy.
VILLANUEVA, J.A.D., concurring and dissenting.
I concur in that part of the majority opinion which allows ROU a set-off of only $8,079, but I would affirm that part of the trial judge's determination which holds that the parties' annual retainer agreement and notice provision thereof were fair and reasonable and enforceable but would reverse the mitigation of damages of *265 $50,000. I do not believe that this retainer agreement to provide general legal services nationwide for a fixed term for a fixed amount is unethical or that the period of notice for termination, bargained for by the parties based upon unique facts, is unreasonable or unethical.
I agree with the majority's position that the agreement is subject to appropriate "higher ethical and professional standards imposed by our Supreme Court", supra at 259, 645 A.2d at 1258, but disagree, as did plaintiff's expert and the trial judge, with the majority's conclusion that the subject agreement violates those rules.
There are two kinds of retainer agreements between lawyer and client: special retainers and general retainers. A special retainer is an agreement between an attorney and client in which the client agrees to pay the attorney a specified fee for a particular case or a particular service in exchange for specified services. The fee may be based on an hourly, percentage or other rate and may be paid either in advance or as the services are rendered.
A general retainer is an agreement between attorney and client in which the client agrees to pay a fixed sum in consideration for the attorney's continual availability to perform, at a specified price, any legal services necessary during the specified period. "Because the general retainer fee is given in exchange for availability, it is a charge separate from fees incurred for services actually rendered. In other words, such fees are earned when paid because the payment is made for availability." Lester Brickman and Lawrence A. Cunningham, Nonrefundable Retainers Revisited, 72 N.C.L.Rev. 1, 6 (1993). The agreement is, effectively, an option contract because the client has the right, at any time during the specified period, to direct the lawyer to render services.
An attorney and client may also create a hybrid general-special retainer by agreeing that part or all of the general retainer fee be applied to the bill for any services actually performed. Id. at 5-6, 23; see also 7A C.J.S., Attorney & Client § 165 (1980).
*266 A nonrefundable retainer is one that allows an attorney to keep an advance payment irrespective of whether the services contemplated are rendered. It is important to distinguish between the nonrefundable retainer and the general retainer. The nonrefundable retainer, a subspecies of the special retainer, arises only in conjunction with the rendering of specified services for a specified fee. A general retainer is not paid for the rendition of legal services, but rather for assured availability to perform legal services. Thus the nonrefundable retainer and the general retainer are separate and distinct arrangements. Although it is technically correct to refer to the general retainer payment as nonrefundable, this is a misleading characterization. Brickman & Cunningham, supra, 72 N.C.L.Rev. at 8 n. 26.
Lawyers have to make at least two present sacrifices when they commit to a general retainer agreement: they have to reallocate their time so that they can be ready to serve the general retainer client to the exclusion of other clients and they give up their right to be hired by persons with interests that might conflict with the general retainer client, thus again foregoing potential income. Cohen made those sacrifices. He allocated his time so that he could serve ROU and was precluded from representing other unions or competing clients without obtaining permission from ROU.
The subject agreement was not simply a retainer agreement for the purposes of rendering legal services in a single controversy or several specific controversies. This agreement should not be confused with a nonrefundable retainer or contingent fee agreement. It is more akin to an employment contract because it obligated Cohen as general counsel to ROU to furnish legal services for whatever legal issue arose, remain constantly available whenever and wherever needed in the United States and furnish services on short notice. In return for Cohen's continual availability, ROU promised a minimum remuneration ($100,000) for a fixed term of employment based upon a reduced hourly charge, renewable annually unless terminated by giving six months notice. In *267 essence, Cohen agreed to concentrate on ROU's business[1] and be available whenever needed for at least one year and, in consideration for and in furtherance of that promise, ROU agreed to guaranty certain compensation.
The principal issue is whether such an agreement, including the notice of termination provision, is unethical per se, and therefore unenforceable. We have some guidance from an Ethics Opinion regarding whether it is ethically permissible for an attorney to charge a nonrefundable retainer "under any circumstances." Advisory Committee on Professional Ethics, Formal Op. 644, 126 N.J.L.J. 966, Oct. 11, 1990.[2] The Committee, in concluding that nonrefundable retainers are not unethical per se, stated:
In considering this question, we have had the benefit not only of the authorities advanced by the inquirer, but also of the report of an Ad Hoc Committee on Non-Refundable Retainers which was established by the State Bar Association for the purpose of developing a response to the inquiry. We conclude, as did the Ad Hoc Committee, that nonrefundable retainers are not unethical per se but are subject always to the overriding precept that any fee arrangement must be reasonable and fair to the client.
The applicable Rules of Professional Conduct do not deal explicitly with the subject of nonrefundable retainer fees. RPC 1.5 provides that "(a) lawyer's fee shall be reasonable," and goes on to enumerate eight factors to be considered in determining reasonableness. Among these are several which are extrinsic to the actual performance of legal work, notably including "the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer." RPC 1.5(a)(2). The factor inferentially supports the view that a retainer may be fully earned, and therefore nonrefundable, when the attorney stands ready to provide the anticipated representation, whether or not it actually materializes. See Conover v. West Jersey Mortgage Co., 96 N.J. Eq. 441, 451, 126 A. 855 (Ch. 1924). It does not, however, answer the question directly.

RPC 1.16(d) deals with the termination of representation, and requires "refunding of any advance payment of fee that has not been earned." But this Rule does not address the question of whether or under what circumstances a fee may be considered "earned" upon receipt, and thus does not by its terms preclude nonrefundable retainers.
*268 The report of the Ad Hoc Committee on Non-Refundable Retainers dated February 2, 1990, listed four illustrations[3] of why "a non-refundable retainer is not impermissible." Even if a nonrefundable retainer were unethical per se and unenforceable, that prohibition would not apply to general retainer agreements such as the one between Cohen and ROU.
An attorney has a duty to withdraw from employment when his client discharges him. Taylor v. Hoboken Bd. of Educ., 187 N.J. Super. 546, 553, 455 A.2d 552 (App.Div. 1983) (stating that "DR 2-110(B)(4) [now RPC 1.16(a)(3)] is unequivocal as to an attorney's duty to withdraw from employment when his client discharges him"), certif. denied, 95 N.J. 228, 470 A.2d 441 (1983).
New Jersey cases make a clear distinction between situations in which an attorney seeks only to be compensated for breach of a general agreement, such as in the instant case, and cases in which the attorney seeks to be reinstated. Compare Taylor v. Hoboken Bd. of Educ., supra, (denying reinstatement to an attorney seeking tenure as school board attorney under N.J.S.A. 38:16-1) with Parker v. M & T Chemicals, Inc., 236 N.J. Super. 451, 460, 566 A.2d 215 (App.Div. 1989) (allowing in-house counsel to assert a claim for damages for discharge in violation of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -8).
Although both Taylor and Parker involved statutory provisions not applicable here, nonetheless, the same argument was made in Parker and herein by ROU that was accepted by the majority: that such a payment would discourage free exercise of the client's right to terminate the services of counsel. In Parker, we upheld the right of clients to terminate the services of counsel, but rejected the right of clients to refuse to pay for the balance of the *269 term of a general agreement, distinguishing between injunctive relief and damages. In this case, like Parker, Cohen seeks only damages, not reinstatement, which was sought by Taylor.
Contracts for contingent fees or particularized services entitle the attorney to collect only on a quantum meruit basis for services already rendered but not for services yet to be performed. In re Estate of Poli, 134 N.J. Super. 222, 226-27, 338 A.2d 888 (Cty.Ct. 1975) (involving a contingent fee agreement with no fixed term).
The majority's reliance on out-of-state cases to limit Cohen to recover under quantum meruit, is unjustified. Except for In re Cooperman, 83 N.Y.2d 465, 611 N.Y.S.2d 465, 633 N.E.2d 1069 (1994), all those cases[4] involved a contingent fee agreement or modified contingent fee agreement.
Lawyers and clients should not be precluded from freely entering into contracts which are fair and reasonable when executed. Merely because of the special nature of the attorney/client relationship and the "fact that the legal profession is viewed with suspicion by a substantial segment of the public," as the concurring opinion states, supra at 263, 645 A.2d at 1260, does not mean that bonafide, reasonable retainer agreements between lawyers and clients, for a fixed term for a fixed amount, based upon mutual considerations, should not be enforceable.
ROU, relying upon RPC 1.5(a), which provides that a lawyer may only charge reasonable fees, argues that "the judgment in favor of Cohen basically grants him an unreasonable fee because he failed to perform any services whatsoever for 1990," supra at 251, 645 A.2d at 1254. The fallacy with that conclusion is that the fee agreement was reasonable when executed in 1987, remained *270 reasonable in 1988 and 1989 and, considering Cohen's performance during the prior two years, did not become unreasonable on December 28, 1989, because ROU unilaterally and in violation of the agreement abruptly terminated the agreement and did not request Cohen's services for 1990.
There is no doubt that a court may inquire into the fairness and reasonableness of a contract entered into between an attorney and client concerning the compensation of the attorney, and that the court may, if the facts warrant, revise or cancel such a contract. Hughes v. Eisner, 14 N.J. Super. 58, 64, 81 A.2d 394 (App.Div. 1951). However, a fee agreement "fair and reasonable in its terms, and freely agreed to by the client after mature deliberation, with full knowledge of the situation, should not be carved away by the court except in an entirely clear case." Id. at 65, 81 A.2d 394; see also Grimm v. Franklin, 102 N.J. Eq. 198, 204-05, 140 A. 236 (Ch. 1928), aff'd, per curiam 110 N.J. Eq. 573, 146 A. 914 (E. & A. 1929).
Where an attorney and a client have come to agreement regarding attorney's fees, and the agreement was arrived at after apparent complete disclosure and full consideration, and there was no fraudulent or unfair conduct on part of the attorney, and, as to the client, the agreement is fair, the agreement should not be disturbed by the court, but the parties should be left where they have placed themselves. Gray v. Joseph J. Brunetti Const. Corp., 161 F. Supp. 151, 154 (D.C.N.J. 1958), reversed on other grounds 266 F.2d 809, (3rd Cir.) cert. denied, 361 U.S. 826, 80 S.Ct. 74, 4 L.Ed.2d 69 (1959), (holding that the District Court did not err in its construction of the retainer/modified contingent fee contract and in its fact-finding that it had been fairly negotiated and performed; but that the District Court, in reducing the contingent fee, erred in exercising a "summary jurisdiction," which it did not possess; it further erred in not entering judgment for plaintiff for his full contractual contingent fee of $13,000).
The execution of the agreement herein was not accompanied by any artifice or deception, abuse of confidential relation, or similar indicia generally found in the instances where equity has declined *271 to enforce, as unfair or unconscionable, an agreement voluntarily executed by the parties. See De Caro v. De Caro, 13 N.J. 36, 44, 97 A.2d 658 (1953). Cohen satisfied his duty to advise ROU fully and truthfully of all material and significant facts.
"Our Supreme Court has the exclusive constitutional responsibility as to admission to the bar, the practice of law, the conduct of attorneys and the attorney-client relationship." Taylor v. Hoboken Bd. of Educ., supra, 187 N.J. Super. at 553, 455 A.2d 552; N.J. Const. art. VI, § II, par. 3; State v. Rush, 46 N.J. 399, 419-12, 217 A.2d 441 (1966). Because the Supreme Court of New Jersey has the power to regulate "every aspect of fee agreements between lawyers and clients," see In re LiVolsi, 85 N.J. 576, 585, 428 A.2d 1268 (1981); American Trial Lawyers v. N.J. Supreme Ct., 66 N.J. 258, 267, 330 A.2d 350 (1974), it could declare that all general retainers for a fixed period of time for a fixed amount could be terminated by the client at any time and no further fees would be due the attorney and it could regulate renewals and terminations. But it has not done so.
With respect to fixed term contracts for legal services, it is stated in 10 Williston on Contracts, § 1285A at page 935 (Jaeger ed. 1967):
However, there is substantial and better authority to the contrary which suggests that ... limiting the remedy [to quantum meruit] unjustifiably deprives the attorney of the benefits of his contract. These cases hold that an attorney should be permitted to recover for breach of contract as in any normal contractual relationship.
[Footnotes omitted.]
The same position is expressed in an annotation dealing with the discharge of an attorney involving a noncontingent fee, under a section entitled "Employment for Specified Time" wherein it states:
It has generally been held that an attorney who is employed for a specified time at a stipulated sum and who is discharged without cause or fault on his part prior to expiration of the specified term may recover the sum stipulated in the contract as compensation for his services.

*272 [Annotation, Measure or basis of attorney's recovery on express contract fixing noncontingent fees, where he is discharged without cause or fault on his part, 54 A.L.R.2d 604, 628 (1957).]
The annotation discusses cases in various jurisdictions. Although no New Jersey cases are cited, the annotation does refer to the landmark New York case of Greenberg v. Jerome H. Remick & Co., 230 N.Y. 70, 129 N.E. 211 (1920) and states that Greenberg:
... in effect holds that a yearly retainer of an attorney alters the relationship otherwise existing between an attorney and client, such normal relationship including power upon the client's part to discharge the attorney without liability except upon quantum meruit. An attorney who had been employed by the defendant as its attorney and legal advisor for a period of one year at a stipulated compensation for the year, payable weekly, upon being wrongfully discharged after about 5 months, sued for the stipulated salary until the end of the express term of employment, and appealed from affirmance of dismissal of his complaint on demurrer as stating no cause of action. Reversing the judgments, the Court of Appeals held that the contract was not, as to either of the parties, an employment at will and that the discharge of the attorney without cause made the defendant liable for breach of contract, intimating .. . that the measure of damages was the unpaid balance of the stipulated annual salary.
[Annotation, supra, 54 A.L.R.2d at 629.]
This is precisely the finding of the trial judge herein.
The distinction between "fixed term" contracts for fixed sums for generalized legal services and "contingent fee" contracts or "particularized service" contracts has been long recognized in those jurisdictions in which such issues have arisen. Thus, for example, in In re Dissolution of Mosquito Hawks, Inc., 109 So.2d 815 (La. Ct. App. 1959), the Court permitted an attorney to be included as an ordinary creditor of a corporation in judicial liquidation where the attorney had a contract for one year which provided for automatic renewal thereafter on a one-year basis until terminated in writing by one of the parties. The Court upheld the attorney's claims for damages for the unexpired term of the contract, stating:
In this state the relationship of attorney and client is generally held not to be a contract of hiring but that of mandate which is revokable at the will of the client. This principle grew out of cases in which a variety of employment contracts were *273 considered, such as where the services of the attorney were engaged either for a single transaction, or for an indefinite period, or for an unstated amount, or on a contingent basis when not coupled with an interest.
[Id. at 818.]
The Court, however, declined to apply that general rule to the contract there under consideration:
The contract which we now consider does not fall in the same category as the contract of employment in any of the above-cited cases. Opponent's employment by the corporation was for a Definite period and for a Stipulated minimum fee, and this is the difference which we believe takes the contract out of the rule established by the cases above-mentioned.
[Id. at 819. (emphasis added).]
The recent decision of the New York Court of Appeals in In re Cooperman, 83 N.Y.2d 465, 611 N.Y.S.2d 465, 633 N.E.2d 1069 (1994), relied upon by the majority, is clearly distinguishable. That case involved a complaint by a Grievance Committee to discipline an attorney who, after previous warnings, violated the Code of Professional Responsibility by repeatedly using special nonrefundable retainer agreements with his clients. Specifically, it involved nonrefundable retainers in two criminal cases and one probate case. Cooperman, whose conduct was found unconscionable, was suspended from practice for two years but was not ordered to make restitution. Cooperman even acknowledged that the essential purpose of his nonrefundable retainers was to prevent clients from firing him, a purpose which contravenes the Code of Professional Responsibility. The Court noted that they were deciding the precise issue in the case in a disciplinary context only.
What the majority herein fails to note is that, in Cooperman, the New York Court of Appeals explicitly excepted general retainers which continue to be valid:
Our holding today makes the conduct of trading in special nonrefundable retainer fee agreements subject to appropriate professional discipline. Moreover, we intend no effect or disturbance with respect to other types of appropriate and ethical fee agreements (see, Brinckman [sic] & Cunningham, Nonrefundable Retainers Revisited, 72 NC L.Rev 1, 6 [1993]). Minimum fee arrangements and *274 general retainers that provide for fees, not laden with the nonrefundability impediment irrespective of any services, will continue to be valid and not subject in and of themselves to professional discipline.

 [Id. at 476, 611 N.Y.S.2d at 470, 633 N.E.2d at
 1074 (emphasis added).]
This explicit exception came after, and most likely as a result of, Brickman & Cunningham's footnote in their law review article stating that there was confusion among critics of the Appellate Division's opinion in Matter of Cooperman, 187 A.D.2d 56, 591 N.Y.S.2d 855 (1993), because of the court's "failure to declare explicitly that its holding was not applicable to general retainers." Brickman and Cunningham, supra, 72 N.C.L.Rev. at 8 n. 26. Therefore, Greenberg v. Jerome H. Remick & Co. is still the law in New York.
Cohen called Professor Michael Ambrosio[5] as an expert witness in lawyer/client relationships. Ambrosio opined that the agreement herein "is consistent with a fair and reasonable retainer agreement," in accordance with the Rules of Professional Conduct, RPC 1.5. He viewed the agreement as a retainer agreement for payment of moneys for a lawyer to hold himself ready and available to perform legal services. He took into account: a) the long standing and satisfactory relationship enjoyed by the parties; b) Cohen's willingness to respond to any inquiry and be available on a 24-hour basis; c) Cohen's willingness to travel throughout the country to undertake the representation; d) Cohen's agreement to reduce his fee to less than half of what a normal, reasonable fee would have been; e) Cohen's recognized expertise *275 as a labor lawyer; and f) Cohen's previous representation of the client.
Ambrosio said that this agreement is unique, as did the trial judge, because it suggests that the money is to be paid whether or not the services are used but that the sum was to be paid based upon Cohen's availability and was "a fair, good quid pro quo for what was being asked and what was being given." He stated that this contract was not an arrangement "between an unsophisticated consumer and a neophyte lawyer. It's an arrangement between a highly specialized lawyer with a great deal of experience and an international union that essentially engages in the business of negotiating contracts for their membership."
As a quid pro quo for Cohen's agreement to perform the services at below market rate under the conditions described, Ambrosio found it perfectly fair and reasonable that there be a long notice period and an automatic renewal provision. Ambrosio further stated that, in his opinion, the agreement in no way offended RPC 1.8(a), because it is not a contract with respect to an independent transaction but is a fixed fee agreement for a fixed term.
ROU offered no contrary expert opinion.
Considering all the factors of RPC 1.5(a), the $100,000 annual fee under the contract was reasonable because the parties had a lengthy relationship,[6] the subject matter of general counsel duties was complex, Cohen had numerous years of experience in the field and, finally, there was a strong likelihood known to the client that Cohen's duties as national general counsel for ROU would preclude some other employment for Cohen. That likelihood was clear to ROU because it knew that the University of Arizona Law *276 School would need substantial advance notice before appointing Cohen to a full-time position of professor.
The majority's main reason for not permitting Cohen to recover legal fees for 1990 in accordance with the agreement is that he did not perform any services in 1990. The majority fails to distinguish between whether a retainer agreement requiring a lawyer to be available for a fixed period at a reduced fee is void ab initio and whether such an agreement, valid when executed, becomes unenforceable if the client does not request later services. They also state that this retainer agreement with a restrictive thirty-day notice period six months prior to the annual expiration is unreasonable and void as against public policy, supra at 258, 645 A.2d at 1257. The majority's conclusion fails to recognize that the trial judge, after reviewing the basis for the lengthy notice provision, found that the notice provision was reasonable.
The unfairness of the majority's ruling that this agreement violates public policy and our Rules of Professional Conduct "because the six-month notice provision impermissibly infringed upon the client's inherent right to discharge his attorney at will, foisted an unwanted attorney upon a client who lost faith and confidence in his services, and provided for the payment of a contract fee regardless of whether the attorney actually performed any professional legal services," supra at 245-247, 645 A.2d at 1250-1251, is that for more than two years ROU had already taken advantage of the agreement, including the substantially reduced hourly rate.
I disagree with the majority that to permit Cohen to recover for 1990 would be unconscionable because ROU did not ask him to perform legal services in 1990. The fee did not become unconscionable because ROU wrongfully terminated the agreement. It is unfair, if not unconscionable, to deny Cohen recovery under his contract when ROU knew well in advance that Cohen planned his law practice and life based upon the contract and the renewal notice provision contained therein, as the trial judge so found.
*277 If the termination clause is void and unenforceable, Cohen is not fairly compensated for all the legal services that he did perform. He accepted the substantially reduced rate because, in exchange, he was guaranteed a fixed term of employment and advance notice if the annual term was not going to be renewed. Although such a termination clause may be unreasonable and unethical under certain circumstances, taken by itself, the termination clause herein is reasonable, as the trial court found, when considered in the context of this unique situation and specific agreement.
Cohen was compensated for services he rendered in 1988 and 1989 at the rate of only $100 per hour which is a fraction of the reasonable value of his services ($225 per hour according to the proofs). Plaintiff's expert testified that a reasonable fee for an attorney with Cohen's standing in the legal community and experience in providing nationwide representation in this specialized field in 1987 (and presumably in 1988 and 1989) was $225 an hour. Furthermore, because of the agreement under which Cohen performed for two years, Cohen was required to severely limit his other legal activities.
If only the termination clause is unethical and unenforceable, the majority has precluded Cohen from obtaining the reasonable value of the services he already rendered. If the entire agreement is unenforceable, the majority has still deprived Cohen of a reasonable fee for services already rendered.
The majority also focuses on the termination clause and the apparent unreasonableness of granting Cohen $100,000 without his performing any work for ROU in 1990. However, considering that for the two previous years Cohen, solely because of the agreement, substantially reduced his hourly rate for ROU, as evidenced by the rate his prior law firm charged ROU, the rate he charged the plans and the testimony of Professor Ambrosio, as well as Cohen's required continual availability, the award is reasonable, as the trial court found.
If Cohen had been paid the reasonable value of his services, based upon the only evidence in the record, his fee for the 550 *278 hours in 1988 and the 1003 hours in 1989 would amount to $349,425 (550 + 1003 x $225). By virtue of the majority opinion, Cohen receives only $200,450. Therefore, the conclusion in the concurring opinion that "[t]he [termination] clause subjects the client to Draconian damages in the event it exercises its right to discharge its attorney," supra at 264, 645 A.2d at 1260, certainly is not true in this case. The court should not enforce that part of the contract that limited Cohen to only $100,000 per year as compensation for services actually rendered but find the termination clause void and unethical and sever it from the remainder of the contract. The termination clause was integral and material to Cohen's and ROU's agreement to set Cohen's annual fee at $100,000 based upon $100 per hour.
It is not against public policy if a client wants to retain an attorney for a fixed sum to be available for ten days, one month, one year or any other reasonable period of time. Neither does such an agreement violate the Rules of Professional Conduct, as Professor Ambrosio testified. It does not further the interests of either clients or attorneys to establish a public policy which forecloses attorneys and clients from reaching agreement for reduced compensation in return for the assurance of availability for a fixed period of time.
The judge, in a detailed factual review, found the terms providing for a $100,000 annual fee and $150 per hour for every hour over 1000 hours were fair and reasonable, and were actually more advantageous to ROU than its prior obligation to Cohen's former firm and supported by mutually beneficial considerations. The judge also found the six-month notice of termination provision reasonable because faculty hiring decisions were made in June for the following year and because ROU had Cohen at its "beck and call" to travel all over the country upon short notice.
As to ROU's argument that the agreement violated RPC 1.16, the judge noted that Cohen was not "a lawyer with an ongoing practice" who could easily adapt but rather "[a]s a result of his engagement by the ROU, he did not pursue a full-time teaching *279 position. The necessities of representing the ROU prevented him from developing a significant practice in Arizona. The expectations of Cohen and the ROU was [sic] that his time would be principally devoted to Union business." The judge added that Cohen relied on the agreement to his detriment and "had a right to expect that the ROU would terminate the agreement either pursuant to its terms with advance notice or, at least, in a fair manner with just cause if his services were lacking." The court concluded therefore that RPC 1.16 did not preclude a suit for damages for breach of contract.
"A trial court's findings of fact are binding on an appellate court if supported by adequate and credible evidence." Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 607, 560 A.2d 655 (1989) (citing Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974)). "This is particularly so when, ... the significant evidence is largely testimonial rather than documentary, and the trial court has had the opportunity to observe the witnesses and determine their credibility." Ibid. The court's findings are adequately supported by credible evidence in the record.
In enforcing the contract, the trial judge erroneously granted $50,000 in mitigation of damages (based upon the period between July 1, 1990 and December 31, 1990). While rendering his oral opinion, the trial judge, sua sponte, raised this issue. The judge based the mitigation on his finding that Cohen had a duty to mitigate his damages because he knew in December 1989 that he was being terminated and by July 1, 1990 he had time to find alternative employment and indeed did procure other clients. Whether or not this employment agreement was subject to mitigation of damages, ROU had the burden of proof, Roselle v. LaFera Contracting Co., 18 N.J. Super. 19, 28, 86 A.2d 449 (Ch.Div. 1952), and never established any facts or dollar amount that Cohen could have earned or did earn or that he could have obtained a full-time teaching position. There is absolutely no evidence of what compensation, if any, Cohen earned in 1990. In addition, throughout the entire trial mitigation was never an issue because ROU never *280 mentioned it. There was no evidence regarding mitigation, or lack thereof, for Cohen to rebut. Therefore, there should not have been any mitigation of damages.
I would affirm the decision of the trial judge upholding the enforceability of the agreement which requires ROU to pay Cohen $100,000 for 1990; I would reverse that portion of the trial judge's decision that deducted for mitigation and set-offs to ROU except for the $8,079 conceded by Cohen to be owed to ROU. Therefore, I would modify the judgment in favor of Cohen against ROU to $92,371 ($100,450 less $8,079).
NOTES
[1] Although the agreement ostensibly permits a claim for fees absent proper notice of cancellation and irrespective of whether the attorney provided services, we need not address the conscionability or lack thereof of this rather restrictive cancellation provision under general contract principles for reasons we will discuss hereinafter.
[2] In 1987 ROU moved its offices to Panama City Beach, Florida.
[3] ROU and employers of ROU members contributed monies to four ERISA plans and one non-ERISA plan. Each plan had two attorneys, one designated by ROU and the other selected by the employers of ROU members.
[4] The agreement does not contain a provision regarding termination for cause. Both parties, however, seem to concede that this is a basis for termination.
[5] The judge also concluded that had the New Jersey Court Rules applied Cohen would have been in violation of those rules because he commingled certain ROU monies received from the plans with his funds. The judge properly stated that Cohen should have held those monies in escrow or returned them to ROU.
[6] The trial judge also included the three additional hours worked by Cohen in 1989 at the rate of $150 per hour.
[7] As far as we can determine, our Supreme Court has never addressed this committee's opinion.
[8] Similar Disciplinary Rules had been in effect in this state until superseded by the Rules of Professional Conduct, effective September 10, 1984.
[9] Contrary to the views expressed by the dissent, we do not hold that all annual retainer agreements are unenforceable per se. See dissent op. at 267, 645 A.2d at 1262. Nor do we conclude that these types of agreements are void ab initio or valid upon execution but unenforceable if a client does not later request services. See dissent op. at 276, 645 A.2d at 1267. Rather, we premise our holding on ethical and professional principles and limit it to invalidating this particular agreement because the six-month notice provision impermissibly infringed upon the client's inherent right to discharge his attorney at will, burdened the client with an unwanted attorney, and provided for the payment of fees even though the attorney failed to render any legal services whatsoever.
[10] As noted by the dissent, see dissent op. at 272-273, 645 A.2d at 1265-1267, Cooperman explicitly reaffirmed the validity of general retainer agreements. In doing so, however, it also excluded those agreements, as involved here, "laden with the nonrefundability impediment irrespective of any services." Cooperman, supra, 83 N.Y.2d at 476, 611 N.Y.S.2d at 470, 633 N.E.2d at 1074.
[11] Although quoting language by Cohen's hired expert characterizing Cohen as "a highly specialized lawyer with a great deal of experience," see dissent op. at 275, 645 A.2d at 1266, the dissent then suggests that ROU had taken advantage of Cohen during 1988 and 1989 and deprived him of fees concerning those years at a higher hourly rate if the agreement is unenforceable. Neither party, however, disputes the amounts paid or owed in those years nor raised any issues regarding the same on this appeal. Hence, we consider them waived, see Matter of Bloomingdale Convalescent Center, 233 N.J. Super. 46, 48 n. 1, 558 A.2d 19 (App.Div. 1989); State v. Reyes, 237 N.J. Super. 250, 263, 567 A.2d 287 (App.Div. 1989); Pressler, Current N.J. Court Rules, comment on R. 2:6-2 (1994), and address the contract only as it applies to 1990. We note, however, that in 1988 Cohen provided only 550 hours of legal services to ROU, but was paid the entire contract amount.
[12] Despite stating that this agreement is subject to appropriate ethical and professional standards, see dissent op. at 265, 645 A.2d at 1261, our dissenting colleague then abandons and retreats from this position by placing Cohen on equal footing with ROU and essentially applying general contract principles to enforce the agreement.
[13] Of course, even if we put aside the public policy and ethical considerations involved and decided that ROU had in fact breached its agreement with Cohen in 1990, we would still reduce this $100,000 figure and limit Cohen's recovery as the aim of awarding damages for breach of contract is to put the injured party in as good a position as he would have been in had performance been rendered as promised. Thus, in determining the propriety of damages, the trial court would not have been able to accept blindly the entire contract fee, but would have been obligated to consider the costs associated with Cohen's rendering of legal services to ROU for 1990 and reduce the $100,000 fee accordingly. Failure to do so would have placed Cohen in a far better position than he would have been in had ROU kept its promise and, as Judge Baime states in his concurrence, given him a one year paid vacation.
[14] Notwithstanding the dissent's statement that Cohen had to "remain constantly available whenever and wherever needed in the United States and furnish services on short notice," see dissent op. at 266, 645 A.2d at 1262, we find that the availability requirements imposed upon Cohen were hardly onerous, but basically required him to be available by telephone, as quoted in our factual recitation. Instead, they exemplify the rather typical constraints imposed upon any attorney engaged in the practice of law.
[15] Despite recognizing that an attorney has a duty to withdraw when discharged, see dissent op. at 268, 645 A.2d at 1263, our dissenting colleague ignores and fails to adopt the necessary corollary prohibiting a suit for damages upon the exercise of this implied condition. In so doing, the dissent diminishes the special attorney-client relationship by "substantially altering" and "economically chilling" the client's unbridled right to discharge his attorney at will, adopts a hollow right to terminate, misses the economic realities pervading the exercise of this right, and ignores the weighty authority in support of this proposition. See Cooperman, supra, 83 N.Y.2d at 473, 611 N.Y.S.2d at 468, 633 N.Y.S.2d at 1070.
[16] Theoretically, under Cohen's argument, ROU never provided appropriate or effective termination for any year under the rather peculiar and unduly restrictive termination clause in the agreement between the parties.
[1] By agreeing to perform 1,000 hours, it meant that Cohen had to be available for the equivalent of 125 full eight-hour days.
[2] As the majority notes, supra at n. 7, our Supreme Court never took any action to confirm the Committee's opinion or clarify the issue.
[3] One illustration was EXAMPLE 4:

A corporation anticipates that it may need the services of an attorney and retains a law firm with a request that the firm be ready to proceed on the matter at any point during the next 10 days. The law firm requests the payment of a non-refundable retainer and puts itself on call to the client, ready to proceed. Ultimately, the services of the firm are not required.
[4] Martin v. Camp, 219 N.Y. 170, 114 N.E. 46 (1916); Plaza Shoe Store, Inc. v. Hermel, Inc., 636 S.W.2d 53, 58 (Mo. 1982); Rosenberg v. Levin, 409 So.2d 1016, 1021 (Fla. 1982); Covington v. Rhodes, 38 N.C. App. 61, 247 S.E.2d 305, 308 (1978), rev. denied, 296 N.C. 410, 251 S.E.2d 468 (1979); Fracasse v. Brent, 6 Cal.3d 784, 100 Cal. Rptr. 385, 389, 494 P.2d 9, 13 (1972); Cole v. Myers, 128 Conn. 223, 21 A.2d 396, 399 (1941).
[5] Ambrosio was a law professor at Seton Hall School of Law for twenty-three years, currently teaching legal philosophy and jurisprudence, law and morality, remedies and professional responsibility. He also has authored many publications about professional conduct and served on many committees, such as the Supreme Court Committee and New Jersey State Bar Association Committee to evaluate rules of professional conduct, represented lawyers in disciplinary proceedings and testified as an expert witness both for plaintiffs and defendants in legal malpractice cases.
[6] Cohen's former firm (Marchi) became general counsel to ROU in 1975 and, for a five-year period, the firm performed various legal services for ROU. During this period of time, Cohen spent approximately 50% of his professional time working on ROU business.